# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLANIA

| | | |
|---|---|---|
| MUMIA ABU-JAMAL | : | Case No. 3:16-CV-2000 |
| Plaintiff, | : | |
| | : | |
| v. | : | Judge Robert D. Mariani |
| | : | |
| John Wetzel, Secretary of Pennsylvania Department of Corrections | : | **JURY TRIAL DEMANDED** |
| | : | |
| Dr. Paul Noel, DOC Bureau of Health Care Services Chief of Clinical Services, member of Hepatitis C Treatment Committee | : | **ELECTRONICALLY FILED** |
| | : | |
| Bureau of Health Care Services Assistant Medical Director, member of Hepatitis C Treatment Committee | : | |
| | | |
| Bureau of Health Care Services Infection Control Coordinator, member of Hepatitis C Treatment Committee | | |
| | | |
| Correct Care Solutions representative on the Hepatitis C Treatment Committee | | |
| | | |
| Correct Care Solutions | | |
| | | |
| Joseph Silva, DOC Director of Bureau of Health Care Services; | | |
| | | |
| Treating Physician SCI Mahanoy | | |
| | | |
| Defendants. | | |

**FILED
SCRANTON**

SEP 3 0 2016

PER _BKM_
⎯⎯⎯ **DEPUTY CLERK**

## COMPLAINT

## JURISDICTION

1. This is an action for injunctive relief for violations of the Eighth and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

3. This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Middle District of Pennsylvania.

## PARTIES

4. Mumia Abu-Jamal is an African-American currently incarcerated in the custody of the Pennsylvania Department of Corrections (DOC) at the State Correctional Institution at Mahanoy. Mr. Abu Jamal's case is well-known world-wide and is considered by many to be a case of injustice. Mr. Abu-Jamal is suffering from chronic hepatitis C. The disease has caused and is causing severe health problems. He has requested that he be provided with anti-viral medication that would cure his disease but the defendants have denied that treatment.

2

5.  Defendant John Wetzel is the Secretary of the Pennsylvania Department of Corrections.  In that capacity he is responsible for the formulation and implementation of policies within the DOC including but not limited to those concerning inmate health care, including policies for the treatment of hepatitis C.  He is sued in his official capacity for injunctive relief.  At all times relevant hereto, Defendant Wetzel acted under color of state law.

6.  Defendant Paul Noel, M.D. is the Chief of Clinical Services for the DOC's Bureau of Health Care Services (BHCS).  In that capacity he has oversight over the delivery of health care services to inmates within the DOC.  In addition, Dr. Noel sits on the Hepatitis C Treatment Committee that is responsible for implementing the DOC's hepatitis C protocol and makes recommendations concerning which inmates will receive hepatitis C treatment.  He is sued in his official capacity for injunctive relief.  At all times relevant hereto defendant Noel acted under color of state law.

7.  Defendant BHCS Assistant Medical Director is a DOC official who sits on the Hepatitis C Treatment Committee that is responsible for implementing the DOC's hepatitis C protocol and makes recommendations concerning which inmates will receive hepatitis C treatment. He or she is sued in their official capacity for injunctive relief.  At all times relevant hereto defendant acted under color of state law.

3

8. Defendant BHCS Infection Control Coordinator is a DOC official who sits on the Hepatitis C Treatment Committee that is responsible for implementing the DOC's hepatitis C protocol and makes recommendations concerning which inmates will receive hepatitis C treatment. He or she is sued in their official capacity for injunctive relief.  At all times relevant hereto defendant acted under color of state law.

9. Defendant Correct Care Solutions' (CCS) representative on the Hepatitis C Treatment Committee is employed by the corporation contracted to provide medical services to the DOC. This defendant sits on the Hepatitis C Treatment Committee that is responsible for implementing the DOC's hepatitis C protocol and makes recommendations concerning which inmates will receive hepatitis C treatment. He or she is sued in their official capacity for injunctive relief.  At all times relevant hereto defendant acted under color of state law.

10. Correct Care Solutions is the corporation contracted to provide medical services to those who, like plaintiff, are incarcerated in the DOC. This includes the provision of hepatitis C treatment. CCS is sued in its official capacity. At all times relevant hereto defendant acted under color of state law.

11. Defendant Joseph J. Silva is the Director of the Bureau of Health Care Services of the DOC. According to the DOC website, the Bureau of Health Care Services "is responsible for supervising and monitoring the delivery of all medical/dental services…throughout the state correctional system." Defendant Silva is responsible for the formulation and implementation of health care policies within the DOC, including policies for access to treatment for hepatitis C. Defendant Silva is sued in his official capacity only for injunctive relief and not money damages. At all times relevant hereto, defendant Silva acted under color of state law.

12. Defendant Treating Physician SCI Mahanoy is the physician assigned to SCI Mahanoy who is responsible for plaintiff Mumia Abu-Jamal's health care. He or she is sued in their official capacity for injunctive relief and not for money damages. At all times relevant hereto the defendant acted under color of state law.

## STATEMENT OF FACTS

13. This action seeks an injunction against defendants in their official capacities to immediately provide plaintiff, Mumia Abu-Jamal, with the Federal Drug Administration (FDA) approved hepatitis C direct-acting antiviral medications.

### Hepatitis C

5

14. Hepatitis C (HCV) is a virus that infects cells of the liver. Approximately 75-85 percent of individuals infected with the HCV will develop chronic hepatitis C, causing progressive inflammation of the liver.

15. Inflammation caused by the virus can lead to scarring, known as fibrosis, and extreme scarring, known as cirrhosis, both of which affect liver functioning.

16. One of the ways liver inflammation is measured is on the Metavir scale. On that scale F0 means no fibrosis and F4 means cirrhosis

17. Chronic hepatitis C patients with any liver scarring, i.e. greater that F0 are at a greater risk of rapid disease progression.

18. At least twenty percent of chronic hepatitis C patients will develop cirrhosis, and between 2 and 7% of them per year will develop liver cancer.

19. About 19% of those who develop cirrhosis will go on to develop liver cancer.

20. Approximately 20% of all those with chronic hepatitis C will die from complications of the disease.

21. In the United States, hepatitis C causes more deaths than all other infectious diseases combined

22. Chronic hepatitis C often causes complications outside of the liver, including anemia and diabetes.

6

23. Between 20-40% of chronic hepatitis C patients have cutaneous (skin) manifestations of the disease. Among them are the relatively rare conditions of lichen planus and necrolytic acral erythema (NAE), and more common ones such as psoriasis, eczema and pruritus (persistent itching).

24. In or about 2013, new anti-viral drugs became available.  These drugs have a 90-95% cure rate and few, if any, side effects. These drugs, two of which are Harvoni and Sovaldi, have become the standard of care in the medical community.

25. Because of the numerous benefit of early treatment, the American Association for the Study of Liver Diseases (AASLD), recommends that everyone with chronic hepatitis C be treated with those anti-viral drugs irrespective of disease stage on the Metavir scale or prognosis for progression.

26. The Center for Disease Control (CDC) has issued its own guidelines that state that the guidelines issued by the AASLD are the standard of care for the treatment of hepatitis C.

**Hepatitis C and The Policy of The Pennsylvania DOC**

27. The Pennsylvania Department of Corrections (DOC), through its Bureau of Health Care Services is charged with delivery of necessary medical care to inmates under the jurisdiction of the DOC

28. There are at least 5,400 inmates under the jurisdiction of the DOC who have active, i.e. chronic, hepatitis C.

29. In 2013, when the current anti-viral drugs became available, the DOC, through its Bureau of Health Care Services, with the knowledge and approval of defendants Wetzel and Noel, ceased treating all inmates in the custody of the DOC who have active, i.e. chronic hepatitis C.

30. This policy continued under the direction of defendant Noel with the knowledge and approval of defendant Wetzel throughout 2014 and most of 2015.

31. In late 2015, defendant Noel, with the knowledge and approval of defendant Wetzel, formulated and adopted a medical protocol concerning who would be treated and not treated with hepatitis C anti-viral drugs.

32. The hepatitis C protocol was added as Appendix 16-B to the Access to Health Care Procedures Manual of the Department of Corrections and is part of the DOC Policy Statement 13.1.1 entitled "Management and Administration of Health Care". The Policy Statement was personally authorized by defendant Wetzel. See Protocol, Exhibit A attached hereto and made a part hereof.

33. Under that policy, only inmates with decompensated cirrhosis with bleeding are authorized to receive the anti-viral drugs.

8

34. When the disease has advanced to decompensated cirrhosis with bleeding, a person has already suffered irreversible damage to their health and are at a grave risk of death.

35. In addition, long before the disease has progressed to that stage, individuals suffering from it have suffered irreversible damage to their liver, decreased liver function, and are at a significantly higher risk of developing liver cancer. Many also suffer severe extrahepatic manifestations of the disease that adversely affect quality of life.

36. The DOC Policy Statement requires that copies of the Procedures Manual be delivered to each Facility Manager (Superintendent).

37. The protocol delegates to an *ad hoc* grouping known as the Hepatitis C Treatment Committee the authority to make recommendations as to which inmates would receive hepatitis C anti-viral treatment.

38. Defendant Noel as BHCS Chief of Clinical Services, defendant BHCS Assistant Medical Director, defendant BHCS Infection Control Coordinator, and defendant CCS representative all sit on the hepatitis C Committee and implement the policy delegated to them by the hepatitis C protocol authorized by defendant Wetzel.

39. This policy was adopted and implemented by defendants Wetzel, Silva, Noel, CCS, and the Hepatitis C Treatment Committee defendants even

9

though they knew that denying treatment to inmates who did not fall under the protocol had no medical justification, causes harm to those inmates' health and places them at risk of death.

40. The defendants, and each of them, adopted and implemented this protocol even though they knew that the standard of care in the community, as articulated by the AASLD and CDC is to treat all who have chronic hepatitis C.

41. This protocol remains in effect and is administered and enforced by defendants Wetzel, Silva, Noel, CCS, and the members of the Hepatitis C Treatment Committee.

42. In defendant Wetzel's presentation to the Pennsylvania Senate Appropriations Committee in February 2016, during which he made his budget request for the DOC for fiscal year 2016-2017, he said the following about the DOC's projected budget for the treatment of hepatitis C: "In October 2015, the DOC updated its Hepatitis C policy, which included guidelines for the evaluation and treatment of inmates who have this disease. We estimate 50 patients will be treated annually, prioritizing

treatment to those with advanced disease. The estimated cost of treatment is between $3.5 and $5 million."[1]

43. 50 patients are less than 1% of those with chronic hepatitis C in DOC custody. At this rate of treatment it would take more than 100 years to treat everybody with chronic hepatitis C currently in DOC custody.

44. Defendant Wetzel also informed the Senate Appropriations Committee in February 2016 that "[t]he DOC netted further savings by using its status as a covered entity under the Public Health Service Act to obtain HIV and Hepatitis C drugs at reduced prices."

45. As more fully discussed *infra.*, it was pursuant to the refusal of the DOC to treat anyone between 2013 and 2015 and the policy adopted in 2015 that the plaintiff, Mumia Abu-Jamal, was denied and is being denied treatment for his hepatitis C with the anti-viral medications.

**The Plaintiff's Medical Care**

46. During routine blood work performed by DOC medical staff in 2012, Plaintiff Abu-Jamal tested positive for the hepatitis C antibody. He likely contracted the virus during a 1981 blood transfusion.

---

[1] Accessible at: http://www.cor.pa.gov/Documents/2016-2017%20DOC%20Appropriations%20Testimony.pdf.

47. At that time and for the next three years, no one in the DOC medical staff ordered follow-up testing to determine whether his disease was chronic.

48. That Mr. Abu-Jamal had tested positive for the hepatitis C anti-body is noted in his medical records that are in the possession of the DOC.

49. In or about August 2014, Mr. Abu-Jamal's hepatitis C infection began to manifest itself through a severe skin rash that itched incessantly.

50. In that month Mr. Abu-Jamal began to experience itching over his whole body.  Plaintiff went to sick call on several occasions.  Medical personnel prescribed steroid creams. They did not alleviate the rash or the itching.

51. On or about February 11, 2015, Dr. Lisiak, one of his treating physicians at SCI Mahanoy, noted that the itchy rash covered 70% of Mr. Abu-Jamal's body.

52. On February 16 and February 17, plaintiff again went to sick call and saw Dr. Khanum, another treating physician.  Dr. Khanum also noted that the rash covered 70% of plaintiff's body.  Plaintiff told Dr. Khanum that he felt dizzy and experienced some blurred vision.

53. Plaintiff's skin became increasingly dark and scaly.  He continually itched and was in near constant pain and discomfort.  He began using a wheelchair whenever he left the infirmary area.

54. On February 20, 2015, Dr. Khanum ordered that plaintiff be admitted to the facility infirmary.

55. On that same date, Dr. Lisiak noted that plaintiff's blood glucose had risen to an above-normal 167. No one at SCI Mahanoy told the plaintiff that his blood glucose was abnormally high.

56. Although Mr. Abu-Jamal's medical records noted that he had tested positive for the hepatitis C antibody years earlier, none of the medical personnel ordered a test to determine whether the infection was active and/or whether hepatitis C might be the underlying cause of the skin condition and/or the rise in blood sugar levels.

57. In late February 2015, SCI Mahanoy medical staff prescribed another steroid, oral prednisone, and Cyclosporine, an immunosuppressant. The rash persisted. A medical note dated February 19, 2015 recorded the fact that Mr. Abu-Jamal was experiencing "increasing peeling off of dry skin at the site of rashes."

58. Blood work taken on March 6, 2015 showed that Mr. Abu-Jamal's glucose level had risen to the severely abnormal level of 419.

59. No action was taken to address the glucose level. There was no treatment provided, nor any follow up testing of his glucose level. SCI Mahanoy medical staff did not even inform Mr. Abu-Jamal of that test result.

60. On March 30, 2015, Mr. Abu-Jamal lost consciousness.  He was rushed to Schuylkill Medical Center.  Upon testing his blood glucose was found to be 507.  He had gone into diabetic shock and was placed in the Critical Care Unit.

61. Untreated hyperglycemia is a potentially fatal condition.

62. Plaintiff returned to the prison on April 1.  His release papers indicate the prognosis as "guarded" and include the following medical issues: diabetes, new onset, encephalopathy secondary to hyperglycemia, dehydration, acute kidney injury, hyponatremia, hypokalemia, asymptomatic gallstones, skin rash, anemia and a history of hepatitis C.

63. In the weeks following the diabetic shock, Mr. Abu Jamal experienced fatigue, episodes of "brain fog" and emotional distress.

64. Mr. Abu-Jamal's blood work revealed, and continues to reveal abnormalities, including a consistently below-normal-range hemoglobin count.

65. Although the Schuylkill release order noted that Mr. Abu Jamal had a "history" of hepatitis C, neither SCI Mahanoy medical staff nor any of the defendants took any steps to investigate whether the hepatitis C may be the cause of the rash and/or other medical issues.

66. In the weeks and months that followed, counsel communicated with officials at SCI Mahanoy and their counsel via letter in an effort to secure adequate medical care for Mr. Abu-Jamal. Copies of some of the correspondence were sent to the office of the DOC's Director of its Bureau of Health Services, now occupied by defendant Silva, and defendant Wetzel, Secretary of the DOC.

67. Requests included, but were not limited to treatment for the skin condition, a hepatitis C workup and an overall health plan to determine the underlying cause(s) of plaintiff's health issues.

68. On or about April 6, 2015, counsel sent letters to both former SCI Mahanoy Superintendent Kerestes and SCI Mahanoy's Corrections Health Care Administrator (CHCA) John Steinhart. Counsel told Kerestes and Steinhart, *inter alia*, that the plaintiff's blood sugar remained abnormal. Counsel noted that the blood sugar "and other symptoms required specialized diagnostic and treatment care."

69. On or about April 11, 2015, Plaintiff submitted a grievance to the SCI Mahanoy Facility Grievance Coordinator. The grievance stated, *inter alia* that medical staff at Mahanoy had failed to properly diagnose and monitor his health. He requested, *inter alia*, a detailed health care plan and the opportunity to be examined by a doctor of his own choosing.

70. On or about April 28, 2015, CHCA Steinhart responded to the grievance. He denied the grievance stating that Mr. Abu Jamal's medical needs were being met. Defendant Steinhart based his denial on his own review of plaintiff's medical records.

71. Mr. Abu Jamal filed a timely appeal from that denial. He stated that the failure to administer adequate health care had caused serious harm, including hyperglycemia and the skin rash and the failure to determine its underlying cause.

72. On or about May 26, 2015, (after plaintiff's release from Geisinger Medical Center discussed *infra*) Superintendent Kerestes upheld the denial of the grievance. In that denial he stated that he had he had reviewed it and CHCA Steinhart's response and found that response to be "appropriate".

73. The grievance denial failed to address at all Mr. Abu-Jamal's request for a diagnostic workup to determine the underlying cause of his health care issues.

74. On or about May 12, 2015, Mr. Abu-Jamal experienced extreme pain in his lower extremities when showering. Later that day, he was removed from the facility and moved to Geisinger Medical Center.

75. During his May 12, 2015 to May 19, 2015 stay at Geisinger, numerous diagnostic tests were conducted. Blood work showed consistently low hemoglobin levels indicating anemia.

76. While those tests and a subsequent bone marrow biopsy ruled out some serious conditions, including some cancers, the underlying cause(s) of Mr. Abu-Jamal's health problems, including the rash and anemia, were not determined.

77. A CT scan performed at Geisinger noted irregularities in the architecture of plaintiff's liver, a sign of cirrhosis.

78. No hepatitis C workup was performed at Geisinger Medical Center.

79. The discharge report from Geisinger, dated May 18, 2015, noted that Mr. Abu Jamal might be a suitable candidate for hepatitis C treatment. This report was placed in plaintiff's medical records at SCI Mahanoy.

80. None of the defendants' or medical staff at SCI Mahanoy ordered a hepatitis C blood test to determine whether the disease was chronic.

81. As DOC counsel had directed that all communications regarding plaintiff's medical issues be sent to Counsel's Office and not DOC officials directly, matters regarding plaintiff's health were brought to the defendants' attention through communications from plaintiff's counsel to DOC

counsel. Upon information and belief, the content of those letters was shared with defendants Wetzel and Noel.

82. Meanwhile, on June 25, 2015, plaintiff filed a timely appeal to the DOC Central Office of the medical grievance discussed *supra*. He argued that there had yet to be any diagnostic inquiry into his health issues given his "severe adverse health symptoms". There had not been, Mr. Abu-Jamal argued, a determination of the "underlying causation responsible for my health related issues."

83. In or about July 2015, plaintiff's counsel sent another letter to DOC counsel. That letter enclosed a report from a physician who had visited plaintiff at SCI Mahanoy.

84. The report stated, *inter alia*, that in the physician's opinion, the skin condition was an extrahepatic manifestation of hepatitis C.

85. In that same letter plaintiff's counsel requested that bloodwork to determine whether the hepatitis C was active be done forthwith.

86. Neither the defendants nor their counsel responded to the letters from plaintiff's counsel.

87. In or about late July 2015, hepatitis C bloodwork performed by DOC medical staff at Mahanoy revealed a viral load meaning that plaintiff has active hepatitis C and that the disease is chronic.

88. On or about August 13, 2015, DOC Central Office advised Mr. Abu-Jamal

that the appeal of the medical care grievance had been referred to "Central

Office" for further review.  The Bureau or Office taking the action was

listed as the "Bureau of Health Care Services", under whose authority the

Hepatitis C Treatment Committee would be created later in 2015.

89. On or about September 24, 2015, the DOC Central Office affirmed the

denial of plaintiff's medical care grievance.  The denial noted Mr. Abu-

Jamal's admission to Schuylkill in March but did not acknowledge his

admission to Geisinger in May, his skin condition, the CT scan at Geisinger

that was consistent with cirrhosis and/or Mr. Abu-Jamal's request for a

treatment plan for his health issues.

90. In November 2015, Mr. Abu-Jamal filed his first amended complaint in the

related case of *Abu-Jamal v. Kerestes*, 15-Cv-00967. In December 2015, the

Honorable Robert D. Mariani ruled that Mr. Abu-Jamal had exhausted all

administrative remedies for his medical care claims, including his claims of

deliberate indifference to his medical need for hepatitis C treatment. See

Hearing Transcript Volume 1 at 36-37 (holding that "exhaustion [of medical

care and hepatitis C claims] has occurred in this case"). This ruling was re-

affirmed in a subsequent written decision denying medical care defendants'

motion to dismiss plaintiff's hepatitis C claims. *Abu-Jamal v. Kerestes*, 2016

WL 3456935 *5 ("Court finds that Plaintiff's Grievance Number 561400 was sufficient to give prison officials and the Medical Defendants adequate notice of his claims.").

91. On several occasions between late July 2015 and mid-September 2015 plaintiff requested from his treating physicians that his hepatitis C be treated with either Harvoni or Sovaldi, the two anti-viral medications. The physicians told him that the matter was out of their hands, that the DOC was not treating anyone with the antivirals because of the medications' cost.

92. Plaintiff's disease is progressing. He is, at a minimum, at fibrosis level 2-2.5, a level consistent with significant liver scarring. This places him at risk for rapid disease progression.

93. Plaintiff's platelet levels, also a sign of hepatitis C progression, have been consistently below normal since October 2015. His platelet counts were abnormally low in the latest blood work conducted in August 2016.

94. Based upon earlier bloodwork performed in June 2016, there is a more than 50% chance that plaintiff's disease has already progressed to cirrhosis and that he has suffered irreversible liver damage.

95. Plaintiff is now at significantly higher risk of developing liver cancer, portal hypertension (bleeding) and adult onset diabetes.

96. Plaintiff continues to experience itching and severe discomfort from the skin condition.  The therapies that have been applied have provided only temporary relief.

97. The skin condition will only be cured if the hepatitis C is treated.

98. Plaintiff's hemoglobin levels have remained below normal for over one year. Anemia is an extrahepatic manifestation of hepatitis C.

99. On or about August 23, 2015, plaintiff's counsel filed a motion for a preliminary injunction requesting that the defendants in *Abu-Jamal v. Kerestes* provide plaintiff with the anti-viral medication.

100.    The DOC defendants in that case, through counsel, opposed that motion and have refused to provide the plaintiff with that medication.

101.    An evidentiary hearing on that motion was held on three dates in December, 2015.

102.    Defendant Paul Noel testified at that hearing.  He acknowledged that he had reviewed Plaintiff's medical records and concurred with the assessment that the Plaintiff has chronic hepatitis C, has a fibrosis level of at least 2.0, and that he has a HALT-C score indicating that there is a 63% chance that he currently has cirrhosis.

103.    He further admitted that the hepatitis C committee, to wit defendant Noel himself, defendant BHCS Assistant Medical Director, defendant

21

BHCS Infection Control Coordinator and the representative of Correct Care Solutions had determined that the plaintiff not receive the anti-viral medication.

104.   Defendant Noel testified that in reaching that determination, the committee was acting in accordance with the hepatitis C protocol authorized by defendant DOC Secretary John Wetzel and implemented through the office of defendant Silva.

105.   Defendant Noel acknowledged that there is no medical justification for refusing to administer the anti-viral medication to the plaintiff.

106.   Defendant Noel acknowledged in his testimony that he was aware that the recommendation of the American Association for the Study of Liver Diseases (AASLD) is that everyone with chronic hepatitis C should be treated with the anti-viral medication irrespective of disease stage.

107.   On August 31, 2016, Judge Mariani ruled that "[t]he standard of care with respect to the treatment of chronic Hepatitis C is the administration of newly-developed DAA medications, such as Harvoni, Sovaldi, and Viekira Pak." *Abu-Jamal v. Kerestes*, 2016 WL 45746464, *9 (M.D.Pa. 2016).

108.   The Court then found as a matter of law that the DOC's hepatitis C treatment protocol "presents a conscious disregard of a known risk of advanced cirrhosis and death by esophageal hemorrhage," and as such

"presents deliberate indifference to the known risks which follow from untreated hepatitis C." *Id.*

109.   The DOC, through defendants Wetzel and Silva, has legal obligations to provide medical care for all those in their custody, including plaintiff.  The DOC has failed to enact policies and protocols requiring that individuals with chronic hepatitis C, such as Mr. Abu-Jamal, receive medically necessary treatment. Instead, the defendant DOC, defendant Wetzel, defendant Silva, defendant Noel, defendant BHCS Assistant Medical Director and defendant Infection Control Coordinator withhold treatment and expose patients, including the plaintiff Mr. Abu-Jamal to medical injury and risk of further harm, up to and including death.

110.   Defendant Wetzel, defendant Noel, defendant BHCS Assistant Medical Director, defendant Infection Control Coordinator are aware that the current hepatitis C protocol provides no treatment for those with hepatitis C until they have sustained extreme liver damage and related health problems, and only after they have been exposed to severe risks of injury and death.

111.   Despite his knowledge that the DOC's refusal to provide hepatitis C treatment to Mr. Abu-Jamal and other similarly situated prisoners is causing injury and substantial risk of further harm, defendant Wetzel has refused to

take steps to authorize a hepatitis C treatment protocol that provides medically necessary treatment for those infected with hepatitis C.

112.   The hepatitis C policy under which plaintiff has been denied treatment was developed, administered and authorized by the offices of defendants Wetzel, Noel, Silva and Correct Care Solutions, the latter being the entity that is contracted to provide medical services to prisoners in DOC custody.

113.   The policy is currently enforced by the offices of defendants Wetzel, Noel, the other HCV Committee defendants, Silva, and Correct Care Solutions.

114.   The policy is enforced on the facility level by the offices of the Corrections Health Care Administrator (CHCA) Steinhart, Superintendent DelBalso, and the Treating Physician SCI Mahanoy.

115.   Plaintiff is being denied medically necessary treatment, to wit, the anti-viral medication, due to this policy and the actions of the defendants in formulating and implementing it.

116.   The defendants, including but not limited to defendants Wetzel, Noel, the other HCV Committee defendants, Silva, and CCS know through correspondence from plaintiff's counsel, requests made by the plaintiff himself, plaintiff's own medical records, the evidence adduced at the December 2015 hearing in *Abu-Jamal v. Kerestes*, and this Court's August 31,

2016 decision in that case, that their refusal to provide plaintiff with the anti-viral medication has caused plaintiff suffering, irreversible damage to his health, and places him at risk of death.

117.   The sole basis for refusing to provide the anti-viral drugs to plaintiff is monetary cost.

118.   The DOC has actually spent more than $150,000 treating the symptoms and adverse effects of plaintiff's hepatitis C the past two years, far more than it would cost to cure the illness responsible for his health problems.

119.   Plaintiff has no adequate remedy at law.

## CAUSES OF ACTION

### Count I – Deprivation of Eighth Amendment Right to Medical Care for Hepatitis C

(Against all defendants in their official capacities for injunctive relief.)

120.   Plaintiff re-alleges paragraphs 1-119 as if fully stated herein.

121.   Defendants Wetzel, Noel, BCHS Assistant Medical Director, BCHS Infection Control Coordinator, CCS representative on Hepatitis C Treatment Committee, BCHS Director Silva, Correct Care Solutions and treating physician SCI Mahanoy violated and, if injunctive relief is not issued, will continue to violate plaintiff's Eighth Amendment right to be free from cruel and unusual punishment through their deliberate indifference to his chronic hepatitis C. These defendants have failed and are

failing to treat his chronic hepatitis C, causing plaintiff serious injuries, pain,

suffering, and risk of death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A. Grant a preliminary and permanent injunction ordering the defendants to

administer to Mr. Abu Jamal direct-acting anti-viral drugs, such as Harvoni

or Sovaldi as treatment for his hepatitis C.

B. Grant attorneys' fees and costs.


/s/ *Bret D. Grote*
Bret D. Grote
PA I.D. No. 317273
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221
Telephone:  (412) 654-9070
bretgrote@abolitionistlawcenter.org

/s/ *Robert J. Boyle*
Robert J. Boyle
277 Broadway
Suite 1501
New York, N.Y. 10007
(212) 431-0229
Rjboyle55@gmail.com
NYS ID# 1772094
Admitted *Pro Hac Vice*


DATED: September 30, 2016

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of this Complaint upon each defendant in the following manner:

Via email:

For Defendants Wetzel, Noel, Silva, BHCS
Medical Director, BHCS Infection Control Coordinator:
Laura Neal, Esquire
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
lneal@pa.gov

Via email:

For Defendants Correct Care Solutions, CCS representative,
and Treating Physician, SCI Mahanoy
Samuel H. Foreman, Esquire
Caitlin Goodrich, Esquire
sforeman@wglaw.com
cgoodrich@wglaw.com

*s/ Bret D. Grote*
Bret D. Grote
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221

Dated: September 30, 2016

27