IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MUMIA ABU-JAMAL

   Plaintiff,

       v.

JOHN WETZEL, Secretary,
Department of Corrections,

Joseph Silva, DOC Director of Bureau
of Health Care Services

Paul Noel, BHCS Chief of Clinical
Services,

BHCS Assistant Medical Director,

BHCS Infection Control Coordinator,

Correct Care Solutions representative,

Correct Care Solutions,

Treating Physician, SCI Mahanoy

   Defendants.

: 
: 
: Case No. 16-CV-2000
: 
: Judge Robert D. Mariani
: 
: 
: ELECTRONICALLY FILED

**PLAINTIFF'S MEMORANDUM IN
SUPPORT OF MOTION FOR A PRELIMINARY
INJUNCTION**

I.   **STATEMENT OF FACTS**

The plaintiff, Mumia Abu Jamal, an inmate at SCI Mahanoy, suffers from chronic hepatitis C. Although his disease is progressing and his health is deteriorating, the defendants have refused to provide him with direct acting anti-viral drugs, such as Harvoni or Sovaldi, that have a 90-95% chance of curing his disease. Plaintiff respectfully requests an injunction requiring the defendants to provide them to him.

The instant litigation was filed as a related case to *Abu-Jamal v. Kerestes, et al.,* 15-Civ. 967 (RDM). In that case the Plaintiff filed a motion for a preliminary injunction requesting the same relief requested herein. That motion was denied on August 31, 2016 after an evidentiary hearing and post-hearing submissions. In its decision, the court found as a matter of law that the DOC's hepatitis C treatment policy violated the Eighth Amendment. *Abu Jamal v. Kerestes*, 2016 WL 4574646 (M.D. Pa. 2016). However the court concluded that the defendants before it were not the proper parties to whom an injunction could issue.

Filed with the instant motion are the transcripts of the December 2015 evidentiary hearing in *Abu-Jamal v. Kerestes* and some of the exhibits introduced at that hearing and in supplemental filings. A summary of that evidence follows.

Joseph Harris, M.D. testified as an expert in the diagnosis and treatment of hepatitis C. Harris: V1 110.[1] Chronic, or "active", hepatitis C is characterized by the

---

[1] "V1", attached as Exhibit 1, refers to the proceedings on December 18, 2015, "V2", attached as Exhibit 2, refers to December 22, 2015 and "V3", attached as Exhibit 3, refers to December 23,

1

presence of the virus in the bloodstream, known as a "viral load". The plaintiff, Mumia Abu-Jamal, has a viral load and, therefore, chronic hepatitis C. Harris: V1, 112, 138. Inflammation caused by the virus can lead to scarring, known as fibrosis, and extreme scarring, known as cirrhosis, both of which affect liver functioning. Harris: V1, 111-112. At least 20-50% of chronic hepatitis C patients will develop cirrhosis. Between 2 and 7% of them <u>per year</u> will develop liver cancer. Ex. 5, p. 1.[2] The overall progression rate to liver cancer of those with cirrhosis in 19% (*Id.*).  In addition 20% of those that develop cirrhosis will die of other complications of the disease. Ex. 6, CDC Report May 4, 2016.

Chronic hepatitis C often causes complications outside of the liver, including anemia and diabetes. Harris: V1, 112-113, 117. In addition, between 20-40% of chronic hepatitis C patients have cutaneous (skin) manifestations of the disease. Among them are necrolytic acral erythema (NAE), and more common ones such as psoriasis, eczema and pruritus.  Harris: V1, 114-115, 137,  Ex. 7, p. 1 (Hearing Ex. 8) and Ex. 8 (Hearing Ex. 10).

Available anti-viral drugs have a 90-95% cure rate. They have become the standard of care in the medical community and have eliminated "active surveillance" as a treatment strategy. Harris: V1, 119-121. The American Association for the Study

---

2015.

[2] Exhibit 5 to this motion was identified by Dr. Harris as being reliable and introduced as Exhibit 13 at the hearing. Where appropriate certain exhibits will be identified by the Exhibit number assigned in this motion as well as the Exhibit number at the Hearing.

of Liver Diseases (AASLD), a body that the Center for Disease Control (CDC) looks to for establishing the standard of care, recommends that everyone with chronic hepatitis C be treated irrespective of disease stage or prognosis for progression. Harris: V2, 5-6, referencing Ex. 9, AASLD guidelines, and Ex. 10, CDC report on Hepatitis C, p. 5.  The United States Veterans Administration has also recently altered its policy.  It has abandoned prioritization and now treats all chronic hepatitis C patients with the anti-viral medication irrespective of disease stage. Ex. 11.

    Mr. Abu-Jamal tested positive for the hepatitis C antibody in 2012. Abu-Jamal: V1, 47. However, it was not until July 2015 that a blood test confirmed a viral load meaning that he has chronic hepatitis C.  Diagnostic tests performed during 2015 demonstrate that his disease is progressing and that he has significant liver scarring if not full blown cirrhosis.  A sonogram conducted on March 16, 2015 described an "echogenic liver", suggestive of "some sort of hepatic parenchymal disorder" suggestive of liver damage. Ex. 4, p. A17; Harris: V1, 130.  A May 18, 2015 CT scan determined that the "overall appearance of the liver is irregular. Correlate for cirrhosis." Ex. 4, p. A74, a finding consistent with significant fibrosis or cirrhosis. Harris: V1, 131.

    Dr. Harris and the DOC expert Dr. Jay Cowan agreed that plaintiff's consistently lower than normal blood platelet count is indicative of disease progression. Harris: V1, 148;  Cowan: V3, 41.  Mr. Abu-Jamal's platelet counts have been consistently below normal since October 2015, i.e. for the last <u>11 months.</u>

Harris: V1, 150, V2 53; See also Harris Dec. Ex. 12, par. 5 referencing lab reports attached hereto as Ex. 13, p. 47-50.  As of December 2015, Dr. Harris estimated that Mr. Abu-Jamal has stage 2-2.5 fibrosis on the metavir scale, a stage consistent with significant liver scarring. Harris: V2, 21-22.  Dr. Cowan estimated the stage to be level 2, also consistent with consistent liver scarring. Cowan: V2, 75.  Fibrosis at any level "is a strong risk factor for future fibrosis progression". Ex. 9, p. 11.

Defendant Paul Noel testified that the DOC utilizes a formula known as the HALT-C score to determine hepatitis C disease progression.  Utilizing Mr. Abu-Jamal's November 2015 platelet level, a less-than-normal 134 the HALT calculation determined that there is a 63% chance that Mr. Abu-Jamal currently has cirrhosis. Noel: V3, 120, 123. His June, 2016 platelet level was even lower, at 124. Ex. 17.

Mr. Abu-Jamal's hepatitis C has manifested outside of the liver.  For over two years he has suffered from a pruritic rash that has, at times, covered 70% of his body. Abu-Jamal: V1, 49-50. Schleicher: V2, 82-84.  The rash has caused and continues to cause painful itching, fatigue and loss of sleep.  The rash is likely NAE, a relatively rare skin disorder that afflicts people of African descent and is almost always a manifestation of hepatitis C. Harris V1, 136. While the symptoms wax and wane, it is only cured by treating the underlying hepatitis C. (Harris: V1 137, 143).  Dr. Harris emphasized that his opinion that the skin condition is a manifestation of hepatitis C is not contingent upon it being NAE.  It could be psoriasis and the even more common pruritus, both of which are manifestations of the disease V1, 129, 151-152.  Indeed,

the defendants' expert agreed that pruritis, one of plaintiff's chief complaints, is common among those with chronic hepatitis C. Schleicher: V2, 81-82. Mr. Abu-Jamal has continued to suffer from the skin condition, in varying levels of intensity, up until the present day. Ex. 14, ¶¶ 3-8. That the condition has not resolved in over 24 months after potent and continuous treatment "speaks strongly for either necrolytic acral erythema or some condition that's predicated on the hepatitis C that's not going to get better without treatment for the hepatitis C." Harris: V1, 144-145, V2 32. It should resolve once the hepatitis C is treated. *Id.*

Anemia, i.e. low hemoglobin levels, can also be a manifestation of hepatitis C. Mr. Abu-Jamal has been anemic since the spring of 2015. He has been administered Procrit, a drug used to treat anemia. While his hemoglobin levels have risen, they have not returned to normal range. Dr. Harris opined that the fact that the anemia has not resolved in well over a year means that it too is likely caused by the hepatitis C. V1, 117-125; Ex. 12, ¶ 7.

Both Jay Cowan, M.D. and Paul Noel, M.D. testified that they are members of the DOC's hepatitis C review committee. That is the body that allegedly determines which inmates afflicted with the disease will receive anti-viral treatment. Cowan: V3, 4-5. Noel: V3, 129. Noel was instrumental in developing the DOC's current hepatitis C protocol .Ex. 15. Under it, only those with esophageal varices, i.e portal hypertension, are treated. Noel: V3, 105. Esophageal varices are a product of end-stage or decompensated cirrhosis. Due to scarring, blood is backflowed from the

liver creating a risk that blood vessels would burst and, in Dr. Noel's words, create a "catastrophe". If an inmate has advanced fibrosis or less-than-end-stage cirrhosis they are not referred for treatment, but are instead evaluated every six months. Noel: V3, 106, 129.  As of June 2016, the DOC had treated 50 of the over 5000 inmates with chronic hepatitis C. Ex. 16, ¶ 3e.  The DOC's 2017 budget allows for the treatment of no more than 50 additional inmates.[3]

    Mr. Abu-Jamal's risk of progression would be reduced to almost zero if he was offered the anti-viral medication. Cowan: V3, 22-24. Dr. Cowan also agreed with the recommendations of the AASLD that early treatment, i.e. treatment before progression to cirrhosis, has numerous health benefits to the patient and society. Cowan: V3, 25-28; Ex. 9, p. 3. These are among the many reasons that the AASLD has now issued guidelines stating that everyone should be treated with the anti-virals. Cowan: V2, 212; Ex. 9. But even under the July 2015 AASLD guidelines, which recommended prioritization, Mr. Abu Jamal would be in the "high priority" category for treatment. Cowan: V3, 81, referencing Plaintiff's PI Hearing Ex. 2, p. 5.  It is resources, not medicine, that determines treatment decisions. Cowan: V3, 77. Likewise, Dr.  Noel admitted that there was no medical reason why Mr. Abu-Jamal's hepatitis C should not be treated now. Noel: V3, 154.

---

[3] Accessible at: http://www.cor.pa.gov/Documents/2016-2017%20DOC%20Appropriations%20Testimony.pdf

I.       Legal Argument

A. **It Is Likely That Plaintiff Will Succeed In Showing Deliberate Indifference To A Serious Medical Need**

Prison officials "have an obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To prevail on an Eighth Amendment medical care claim a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate a deliberate indifference to that need." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003). "Hepatitis C constitutes the type of 'serious medical need' which triggers Eighth Amendment scrutiny in a corrections context." *Barndt v. Pennsylvania Dept. of Corrections*, 2011 WL 4830181 *9 (M.D.Pa. 2011); See also *Abu Jamal v. Kerestes*, 2016 WL 4574646 (M.D. Pa. 2016).

Deliberate indifference to a serious medical need "requires proof that the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Natale*, 318 F.3d at 582 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendants herein have deviated from the standard of care by refusing to provide an available, safe, and effective cure for Mr. Abu-Jamal's hepatitis C. Alternatively, they know that Mr. Abu-Jamal has suffered from and is suffering from serious complications of the disease and, if not treated, will almost certainly face life-threatening complications.

1. **The Defendants' Deviation From The Standard Of Care For Treatment Of Hepatitis C Constitutes Deliberate Indifference**

Hepatitis C is a major public health issue "[i]n the United States and worldwide". Cowan, V3, 20. Those who, like Mr. Abu-Jamal, have chronic hepatitis C have a 20-50% chance of deteriorating to cirrhosis, or severe liver scarring. That condition can cause liver failure and other life-threatening complications such as portal hypertension. Harris: V1, 111-112, 151; Noel: V3, 112; Ex. 5, p. 1. Of those who develop cirrhosis, 2% to 7% <u>per year</u> will develop liver cancer which represents an actual progression rate of between 11% and 19%. Ex. 5, p. 1. In the United States, hepatitis C caused more deaths each year than all other infectious diseases combined Ex. 6.

In 2014, drugs known as Direct-Acting Anti-Viral medications have been available for treatment of hepatitis C. If administered to someone who like Mr. Abu-Jamal has genotype 1, there is a 90-95% chance of cure. V1, 119-121. Risk of disease progression to conditions such as cirrhosis, liver cancer or even severe fibrosis would be reduced to zero. Cowan: V3, 22-24. In addition, early treatment (i.e. treatment before advanced fibrosis) affords numerous other health benefits. Harris: V1, 118-121; Cowan: V3, 22-27; Ex. 9, AASLD guidelines, p. 2-4, describing benefits of early treatment.

The AASLD to which the CDC looks to set the standard of care, recommends that all chronic hepatitis C patients regardless of disease stage or risk of progression

8

be treated. Harris, V2, 5-6; Ex. 9, Ex. 10. The earlier recommendation for treatment prioritization has been abandoned as not medically justifiable. Harris V2, 6; Cowan: V3, 24-25. These guidelines constitute the medical standard of care for the treatment of hepatitis C. Harris: V1, 123-124; Ex. 10, p. 6.

The defendants concede that Plaintiff has chronic hepatitis C and has, at a minimum, progressed to stage 2 fibrosis. There is also a 63% chance that he has already progressed to cirrhosis. Noel: V3, 59-61, 75, 120-21, 123, 146-47. Even at fibrosis level 2 he is at a significantly increased risk of developing liver cancer and other complications of the disease Harris. Dec. Ex. 12, ¶¶ 10-11; Ex. 9, p. 11 (stating that fibrosis at any level increases risks). The defendants know that if Mr. Abu-Jamal's hepatitis C were treated it would terminate the infection, end the ongoing inflammation and scarring of his liver, and prevent further progression of the disease to decompensated cirrhosis, liver cancer and death. Cowan: V3, 22-23. As Dr. Noel candidly admitted, there is *no medical reason* for denying Mr. Abu-Jamal treatment with the direct-acting anti-viral medications. "I can think of no medical contraindications at this time [for withholding treatment]" he testified. Noel, V3, 154. His sentiment was echoed by Dr. Cowan who testified on cross examination that if he had a private patient with good insurance or sufficient resources, he too, would recommend treatment with the anti-viral medications. Cowan: V3, 68.

"Outright refusal of any treatment for a degenerative condition that tends to cause acute infection and pain if left untreated and (2) imposition of a seriously

unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials." *Abu-Jamal v. Kerestes*, 2016 WL 4574646 *14 (quoting *Harrison v. Barkely,* 219 F.3d 132, 138 (2d Cir. 2000)); See also *Farmer,* 511 U.S. at 837 (knowledge of and disregard of an excessive risk to inmate health and safety constitutes deliberate indifference); *Estelle*, 429 U.S. at 104; *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993); *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Likewise, deviation from the accepted standard of care for treating an illness without medical justification also constitutes deliberate indifference. *Roe v. Elyea,* 631 F.3d 843, 862-63 (7th Cir. 2011); *De'lonta v. Johnson*, 708 F.3d 520, 525-26 (4th Cir. 2013) (failure to provide care consistent with prevailing standard states a claim under the Eighth Amendment); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (treatment that deviates from professional standards may amount to deliberate indifference). Mr. Abu-Jamal is suffering from a serious, chronic disease that causes him physical distress and which, if left untreated, could result in substantially more pain, liver failure, liver cancer and death. Moreover, there is no medical justification for denying treatment. Accordingly the failure to appropriately treat his hepatitis C constitutes deliberate indifference.

      The DOC's protocol falls far below constitutional standards. As Dr. Noel stunningly admitted at the hearing, under the new protocol only those who have deteriorated to decompensated cirrhosis with esophageal varices (bleeding) are

10

referred for treatment. In other words, a person must be in imminent risk of a "catastrophe" (Dr. Noel's words). Noel, V3, 112, 128. Even those with decompensated cirrhosis but no varices are not treated. They are simply seen by a medical professional every month. Noel: V3, 109. The protocol sets forth no plans for treating those, such as Mr. Abu-Jamal who have significant fibrosis or even non-advanced cirrhosis. Noel: V3, 128-129. The DOC does nothing to prevent further deterioration of an inmate's liver or progression to liver cancer Harris Dec. Ex. 12, ¶¶ 8-10, (stating, *inter alia*, that even those to have not progressed to cirrhosis "have a significantly higher risk of developing liver cancer."). The protocol has resulted in only 50 of the more than 5400 inmates with hepatitis C (less than 1%) receiving treatment. Ex. 16 ¶ 3e. That it *affirmatively requires* deterioration to advanced cirrhosis *and* esophageal varices before treatment places it squarely in the realm of those "worst cases" that "may actually produce physical torture or a lingering death[.]" *Estelle*, 429 U.S. at 103. Adherence to a policy for non-medical reasons such as administrative convenience or cost is not a constitutionally valid basis for denying care. *Natale*, 318 F.3d at 582-83; *Roe*, 631 F.3d at 862-63; *Colwell v. Bannister*, 763 F.3d 1060, 1068-69 (9th Cir. 2014). *Cf. BE v. Teeter*, 2016 WL 3033500 (W.D. Wash. 2016) (granting preliminary injunction requiring State to provide hepatitis C anti-viral drugs to Medicaid recipients since such treatment is medically necessary).

### 2. Because Chronic Hepatitis C Is The Cause Of Damage To The Plaintiff's Liver And The Cause of Other Severe Symptoms, Refusal To Treat And Cure The Disease Constitutes Deliberate Indifference.

All of the medical experts who testified at the hearing were in agreement on the following material points. First, plaintiff Mumia Abu-Jamal has chronic hepatitis C. Second, the disease has caused significant fibrosis, or scarring, to Mr. Abu Jamal's liver. On a scale of 0 to 4 with 4 being cirrhosis, Mr. Abu-Jamal is, at a minimum, in fibrosis level 2 or 2.5. Harris: V2, 22; Cowan: V2, 75; Noel: V3, 123. Third, 20-50% of all chronic hepatitis C patients progress to cirrhosis, or severe scarring of the liver. Harris: V1, 111-112, 151; Noel, V3, 106, 129. Ex. 5, p.1. Fourth, cirrhosis has many life-threatening complications, including portal hypertension, liver failure and, in nearly 20% of cases, progression to hepatocellular carcinoma, i.e. liver cancer. *Id.* Fifth, utilizing a formula known as the HALT score, there is a 63% probability that Mr. Abu-Jamal <u>currently has cirrhosis</u>. Noel: V3, 120, 123. Sixth, Mr. Abu-Jamal's platelet count, a sign of disease progression, has been below normal for one year. Harris: V1, 149; Cowan: V3, 41; Noel: V3, 147; Ex. 1, p. A121-A122; Ex. 13, p. 47-50; Ex. 17. These undisputed facts plainly demonstrate that Mr. Abu-Jamal is seriously ill and, if not treated, will be "exposed [] to…an unreasonable risk of serious damage to his future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

For over two years Mr. Abu-Jamal has been suffering from a severe, itchy, and painful rash that has sometimes covered 70% of his body. It has caused flaking of his skin and fatigue. While the symptoms have waxed and waned they have never

disappeared. At the hearing, the evidence conclusively established that the condition is likely secondary to hepatitis C and would resolve if that disease is treated. Harris: V1, 113; Schleicher: V2, 82, 90; Cowan: V2, 44-45; *see* Ex. 7, stating that 20-40% hepatitis C patients have cutaneous manifestations of the disease. As Dr. Harris opined, that the skin condition has not resolved in two years after a variety of "treatments" means that it is in all likelihood a manifestation of hepatitis C. Harris: V1, 127-128, 143-145.

Mr. Abu-Jamal has been anemic for 18 months. The anemia has been treated with a series of Procrit injections and Mr. Abu-Jamal's bloodwork has improved. But they have never returned to the normal range. According to Dr. Harris, that the hemoglobin has not returned to normal range even with Procrit only reinforces the conclusion that hepatitis C is the "chronic disease" causing the "anemia of chronic disease". Harris V1, 146, V2, 44-45; Harris Dec. Ex. 12, 7; Ex. 17.

This is not a case involving a mere dispute between medical professionals. First, there is but one recognized way to treat hepatitis C – that is, with the direct-acting antiviral medications that have the 90-95% cure rate. Second, under the Eighth Amendment the intentional provision of inferior or less efficacious treatment for non-medical reasons constitutes deliberate indifference. *Durmer*, 991 F.2d at 69; *White*, 897 F.2d at 109-11; *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978); *Parkell v. Markell*, 622 Fed. App'x. 136, 141 (3d Cir. 2015).

### B. Mumia-Abu Jamal Has Suffered And Continues To Suffer Irreparable Harm And Absent An Injunction His Health Will Continue To Deteriorate.

By the simple fact that he has chronic hepatitis C, Mr. Abu-Jamal has a 20% to 50% chance of developing cirrhosis. Harris: V1, 111-112, 151; Noel, V3, 106, 129; Ex. 5, p.1. Even at the fibrosis stage 2, the minimum fibrosis level that even the defendants acknowledge he has, plaintiff has a significantly increased risk of permanent liver damage and/or developing liver cancer and Type II diabetes. Harris Dec. Ex. 12, ¶¶ 8-11; Ex. 9. Of course, as the defendants also acknowledge according to his December 2015 HALT score there is a 63% risk he has cirrhosis <u>now</u>. Noel: V3, 120, 123. His platelet count, a key marker of disease progression, has been abnormally low for one year. Harris: V1, 149; Cowan: V3, 41; Noel: V3, 147; Ex. 1, p. A121-A122; Ex. 13, p. 47-50. A relentless, pruritic skin condition, secondary to his hepatitis C, causes constant hardship. Ex. 14. These facts demonstrate that failure to treat Mr. Abu-Jamal will "expose[] him to…an unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 35.

### C. Treating Plaintiff's Hepatitis C Will Not Harm Defendants and Will Further the Public Interest

"There is the highest public interest in due observance of all constitutional guarantees." *United States v. Raines*, 362 U.S. 17, 27 (1960). In addition, "the public has a strong interest in the provision of constitutionally adequate health care to prisoners." *Flynn v. Doyle*, 630 F.Supp.2d 987, 993 (E.D. Wisc. 2009).

An injunction will not impose substantial burdens on the DOC. The only "adverse" consequence would be that Mr. Abu-Jamal would move up in line. If anything, curing Mr. Abu-Jamal's hepatitis C now will reduce future costs for his medical care by eliminating the source of his liver damage and extrahepatic symptoms. The injunction would, therefore, serve the public interest.

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiff's motion for preliminary injunctive relief and order DOC defendants to treat his hepatitis C with the direct-acting antiviral medications.

Respectfully submitted,

*/s/ Bret D. Grote*
Bret D. Grote
PA I.D. No. 317273
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA 15221
Telephone: (412) 654-9070
bretgrote@abolitionistlawcenter.org

*/s/ Robert J. Boyle*
Robert J. Boyle
277 Broadway, Suite 1501
New York, N.Y. 10007
(212) 431-0229
Rjboyle55@gmail.com
NYS ID# 1772094
*Pro hac vice*

*Counsel for Plaintiff*