# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLANIA

| | |
|---|---|
| MUMIA ABU-JAMAL | : |
| | : Case No. 15-Cv-00967 |
| Plaintiff, | : (RDM)(KM) |
| | : |
| v. | : Judge Robert D. Mariani |
| | : |
| JOHN KERESTES, et al. | : Magistrate Judge Karoline |
| | : Mehalchick |
| Defendants. | : |
| | : ELECTRONICALLY FILED |
| | : |

## DECLARATION OF JOSEPH HARRIS, M.D.

JOSEPH HARRIS, M.D. hereby declares pursuant to 28 U.S.C. §1746 that the following is true and correct:

1. I am a physician licensed by the State of New York and was permitted to

give expert testimony at the December, 2015 hearing.

2. This declaration is submitted at the request of counsel for Mumia Abu-Jamal the plaintiff in this case.

3. At the December 2015 hearing I testified that in my opinion Mr. Abu-Jamal's hepatitis C was progressing, that he has already suffered damage to his health and that failure to treat him immediately could place him at risk of further complications or even death.

4. Since the December 2015 hearing I have reviewed available medical records provided to me by plaintiff's counsel. I continue to maintain that opinion.

5. Mr. Abu-Jamal's platelet counts were below the normal range of 150 in tests administered on January 22, 2016, February 4, 2016, February 16, 2016 and April 13, 2016.[1] (Plaintiff's Appendix, Ex.1, p. 47, 48, 49, 50)

6. Platelet levels will fluctuate even in patients with chronic hepatitis C. But what is medically significant here is that Mr. Abu-Jamal's levels have been consistently below normal, or at best at the very bottom of the normal range, since October 2015, a period of nearly seven months. This is a strong indicator that the disease is progressing.

7. Likewise, Mr. Abu-Jamal's hemoglobin levels have remained below the normal range or at the very bottom of the normal range. Hemoglobin levels will also fluctuate. But once again, that they have been below normal or at

---

[1] Some labs use 140 as the bottom of the normal range.

the very bottom of normal range for over one year and after treatment with Procrit, reinforces my diagnosis of "anemia of chronic disease" with the chronic disease being hepatitis C.[2]

8. Citing Dr. Cowan's hearing testimony, the defendants' argue that liver damage caused by hepatitis C is not considered irreversible until the patient advances to the later stages of cirrhosis. (DSMF ¶ 37).

9. This is not accurate. While some patients experience reversal of liver damage after treatment with anti-viral medications, many do not. This is one of the many reasons why early treatment with anti-viral medications is recommended.

10. Moreover, so long as the hepatitis C remains untreated, patients who have not advanced to cirrhosis have a significantly higher risk of developing liver cancer and other, sometimes fatal, complications of liver disease (AASLD Guidelines Plaintiff's Exhibit 18, p. 4).

11. Patients with untreated hepatitis C also have a 3-fold greater risk of developing Type II diabetes (*Id.* at p. 4).

12. I have reviewed the Pennsylvania Department of Corrections (DOC) alleged hepatitis C protocol. It authorizes treatment only for those whose disease has advanced to decompensated cirrhosis with portal hypertension.

---

[2] I have been informed that the most recent bloodwork in June 2016 showed a hemoglobin level of 12.9 which is below the normal range.

13. Patients at that stage of disease are at a grave risk of death. To deny treatment to those who have not so advanced is, in addition to being below the standard of care in the community, highly unethical, bordering on criminal.

14. The protocol not only places the individuals denied cure at risk, it places the public at large at risk. Hepatitis C is a communicable disease. Many of those in prison will be released back into the community. If they are not cured, there is a substantial risk that they will infect others and significantly increase human suffering and, of course, the expenses associated with treatment. This is reflected in the recent increase in HCV infections in women and infants, as documented in the *Centers for Disease Control Weekly*, July 22, 2016.

15. The article, "Characterizing the Burden of Hepatitis C Infection Among Entrants to Pennsylvania State Prisons, 2004-2012," in *Journal of Corrective Healtchare, 2016, 22:1, 41-45* reports that the number of Pennsylvania DOC cases infected have a prevalence rate of more than 18.1 percent—approximately 18,000 were infected. However only 7,633 had confirmatory testing, and 69.3 percent—approximately 5,268 inmates—were found to have active disease. Overall approximately 20 percent will have cirrhosis. Of those, approximately 1 percent to 7 percent yearly will advance to hepatocellular carcinoma (HCC). (*Clinical Molecular Hepatology, 2015 June;*

*21(2):105-114*). Thus in the nearly two years that the DOC didn't treat patients, at least twenty have likely advanced to HCC from cirrhosis. So anywhere from ten to seventy patients per year will probably now need liver transplants in the DOC. Their overall prognosis is extremely poor.

16. Esophagogastroduodenoscopy (EGD) for diagnosis is medically inappropriate. EGD is recommended to assess the staging of the cirrhosis, not for diagnosis of the cirrhosis.[3] Varicies already indicate severe portal hypertension. Thus the DOC's plans to treat (it hasn't treated many yet) only after severe cirrhosis and portal hypertension falls below the standard of medically accepted treatment modalities. Thus, mortality will skyrocket. At minimum 49 percent of cirrhosis is not reversible. Assuming that 20 percent of patients have cirrhosis, the number of DOC inmates with it is approximately 1,053 patients. The DOC reports treating close to fifty patients. Thus nearly <u>95 percent</u> of patients with cirrhosis haven't been treated.

17. The denial of medications as a punitive measure will mean death or severe morbidity for these patients. The DOC's protocol cites various, trivial reasons for denial of treatment, including tattooing and cannabis use. The denial of treatment is reminiscent of the amoral, unethical denial of

---

[3] Screening esophagogastroduodenoscopy (EGD) for the diagnosis of esophageal and gastric varices is recommended *when the diagnosis of cirrhosis is made."* Emphasis added.- *(*AASLD Practice Guidelines Hepatology, Vol. 46 #3, Dr. Guadelupe Garcia-Tsao).

treatment to patients in the Tuskegee experiments, and amounts to a death penalty for smoking marijuana or engaging in other minor infractions that the DOC deems a basis for denial of care, and is unprecedented, excessive, and cruel, given the horrible symptoms that withholding treatment will cause in patients infected with Hep C.

18. In addition, prevalence of HIV in a correctional setting is estimated to be four times higher than the general population. This means, for example, that in a population of 100,000 inmates, approximately 1,500 to 2,000 are HIV positive. An estimated 40 percent to 50 percent of the HIV-positive inmates will be co-infected with Hep C. Therefore, conservatively, more than 1,000 to 2,000 inmates in the Pennsylvania prison system are co-infected and among the highest priority for immediate treatment. Thus, in this highly vulnerable group more than 95 percent have not been treated, nor do there seem to be any plans to treat them. This doesn't include the chronic Hep B/HIV co-infected who also have indication for immediate treatment. Thus the DOC is not only inappropriately denying treatment to eligible patients with its current protocol, it isn't treating the patients that are in need of immediate treatment.

Dated: August 4, 2016

JOSEPH HARRIS, M.D.