THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MUMIA ABU-JAMAL,                    :
                                    :
            Plaintiff,              :
    v.                             :        3:16-CV-2000
                                    :        (JUDGE MARIANI)
JOHN WETZEL, et al.,               :
                                    :
            Defendants.            :

## MEMORANDUM OPINION

### I. INTRODUCTION & PROCEDURAL HISTORY

Presently before the Court is Plaintiff's Motion for a Preliminary Injunction, (Doc. 7),

filed October 10, 2016. Plaintiff, a state prisoner, seeks this injunction to require

Defendants to immediately treat his active hepatitis C infection with direct-acting antiviral

drugs. (Doc. 7). This is not Plaintiff's first attempt at such relief. On August 31, 2016, this

Court, in a related case, denied Plaintiff's request for a preliminary injunction seeking the

same relief. *Abu-Jamal v. Kerestes*, 2016 WL 4574646 (M.D. Pa 2016).[1] Thus, to fully

understand the posture in which the present case comes before this Court, a brief history of

both cases is necessary.

Plaintiff, Mumia Abu-Jamal, filed a complaint in *Abu-Jamal 1* on May 18, 2015,

"claiming violations of the right to association and access to the courts." *Abu-Jamal v.

Kerestes*, 2016 WL 4574646, at *1. On August 24, 2015, Plaintiff filed a motion for a

---

[1] For clarity, this Court will refer to the Court's former decision as *Abu-Jamal v. Kerestes*, while
referring to that case's docket as a whole as "*Abu-Jamal 1*."

preliminary injunction seeking to compel Defendants—various medical staff involved in the treatment of his medical conditions and several Pennsylvania Department of Correction ("DOC") staff—to provide him with "immediate treatment of his hepatitis C with recently developed direct-acting antiviral ("DAA") medication." *Id.* This Court held a three day evidentiary hearing on the matter in December of 2015. *Id.*

In an Opinion issued on August 31, 2016, this Court found that the "DOC has an interim protocol to address patients with hepatitis C" and that, under that protocol, a "Hepatitis C Treatment Committee has the ultimate authority to decide whether" an inmate is treated with DDA medications. *Id.* at *5, *8. This Court went on to conclude that "[t]he protocol as currently adopted and implemented presents deliberate indifference to the known risks which follow from untreated chronic hepatitis C." *Id.* at *9. This Court, however, did not issue a preliminary injunction because "[i]t was the Hepatitis C Treatment Committee who made the decision not to give Plaintiff DAA medications and that had, and continues to have, the ultimate authority to determine whether or not Plaintiff will receive the DAA medications," and "[t]he named Defendants [were] not members of the Hepatitis C Treatment Review Committee."[2] *Id.* Thus, this Court concluded that it could not "properly

---

[2] Two weeks prior to the issuance of the Court's Opinion, Plaintiff moved for leave to file a third amended complaint. The third amended complaint would name one member of the Hepatitis C Treatment Review Committee, Dr. Paul Noel, as a defendant. The Court has not yet ruled on this motion.

2

issue an injunction against the named Defendants, as the record contain[ed] no evidence that they ha[d] authority to alter the interim protocol or its application to Plaintiff."[3] *Id.* at \*10.

On September 30, 2016, Plaintiff filed the Complaint in this action alleging a single count titled "Deprivation of Eighth Amendment Right to Medical Care for Hepatitis C" and naming the following as defendants: John Wetzel, Secretary of Pennsylvania Department of Corrections; Dr. Paul Noel, DOC Bureau of Health Care Services Chief of Clinical Services, member of Hepatitis C Treatment Committee; Bureau of Health Care Services Assistant Medical Director, member of Hepatitis C Treatment Committee; Bureau of Health Care Services Infection Control Coordinator, member of Hepatitis C Treatment Committee; Correct Care Solutions representative on the Hepatitis C Treatment Committee; Correct Care Solutions; Joseph Silva, DOC Director of Bureau of Health Care Services; and Treating Physician SCI Mahanoy. (*Id.*). On October 5, 2016, Plaintiff filed a Motion for a Preliminary Injunction seeking the relief this Court denied in *Abu-Jamal v. Kerestes*. (Doc. 7). In support thereof, Plaintiff attached the transcripts from the evidentiary hearing held in *Abu-Jamal 1*. During a conference call held on December 1, 2016, all parties agreed that a new evidentiary hearing was not necessary and that this Court could decide the present

---

[3] Plaintiff has filed a Motion for Reconsideration of the Order stemming from the *Abu-Jamal v. Kerestes* Opinion. The Court has yet to rule on that motion.

motion on the basis of the exhibits filed.[4]  The issue has been fully briefed and is now ripe

for decision.  For the reasons set forth below, the Court will grant Plaintiff's Motion.

## II. FINDINGS OF FACTS

Because the Court is relying on the testimony that was given in *Abu-Jamal 1*, the

Court adopts the following findings of facts from *Abu-Jamal v. Kerestes*:

### Hepatitis C and Treatment Thereof

1.     The DOC Defendants' expert witness Dr. Jay Cowan is licensed to practice medicine in Pennsylvania, New York, and New Jersey and is double board-certified in internal medicine and gastroenterology and hepatology. (Cowan Test., Dec. 22, 2015, Doc. 95 at 196:9-13, 197:10-11). He has been the Medical Director of the Rikers Island correctional facility since 2011. (*Id.* at 198:1-4). Dr. Cowan has treated patients with hepatitis C in his capacity as the Chief of Gastroenterology at North General Hospital in Harlem, New York City, in private practice in Harlem, through his work in Harlem Hospital's Division of Gastroenterology, and in his work at Rikers Island. (*Id.* at 197:20-198:11).

2.     Chronic hepatitis C is a serious disease that is a major public health issue in the United States and worldwide. (Cowan Test., Dec. 23, 2015, Doc. 96 at 20:17-22). It is the number one reason for liver transplants in the United States at present, as well as the number one cause of liver cancer in the United States. (*Id.* at 21:22-22:2).

3.     Hepatitis C is contagious and transmitted primarily by blood. (Cowan Test., Dec. 23, 2015 at 22:3-5).

4.     Dr. Cowan testified that of those individuals infected with Hepatitis C, 75 percent to 85 percent will develop chronic hepatitis, which is inflammation of the liver. Of those who develop chronic hepatitis, 20 percent

---

[4] *See Prof'l Plan Exam'rs of N.J. v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984) ("As a general principle, the entry or continuation of an injunction requires a hearing. Only when the facts are not in dispute, or when the adverse party has waived its right to a hearing, can that significant procedural step be eliminated.") (internal citations omitted).

to 30 percent will go on to develop cirrhosis over the next 10 to 20 years. Of the individuals who develop cirrhosis, two percent to seven percent will develop hepatocellular carcinoma. (Cowan Test., Dec. 22, 2015 at 199:16-25). During cross examination, Dr. Cowan also testified that of those exposed to hepatitis C, between 50 percent and 85 percent will develop chronic hepatitis. (Cowan Test., Dec. 23, 2015 at 21:7-8).

5.     Cirrhosis represents a late stage of progressive hepatic fibrosis, characterized by distortion in the liver architecture and the formation of regenerative nodules that no longer allow the liver to function properly. (Cowan Test., Dec. 22, 2015 at 201:21-202:1).

6.     Individuals with cirrhosis often experience a decrease in the number of platelets circulating in their blood. Cirrhosis may have an impact on both platelet production and platelet survival. (*Id.* at 204:18-205:1).

7.     Individuals with cirrhosis are at an increased risk for ascites, which is an accumulation of peritoneal fluid in the abdominal cavity, for portal hypertension, for hepatic encephalopathy, which is mental confusion associated with the increased toxic burden that the liver cannot filter out, and for the occurrence of jaundice and/or rising bilirubin levels in the bloodstream. These are markers of decompensated cirrhosis. (*Id.* at 207:23-208:14).

8.     Metavir scores indicate the level of fibrosis in the liver on a five-point scale from F0 to F4. F2 and F3 mark the progression of fibrosis from less severe to more severe, with F4 marking cirrhosis. (*Id.* at 202:9-13).

9.     Dr. Cowan testified that very often, medical professionals cannot predict the rate of progression of fibrosis. (*Id.* at 208:15-20).

10.    Correct Care Solutions ("CCS") is the contracted health provider for the DOC. (Cowan Test, Dec. 23, 2015 at 4:14-16).

11.    Dr. Cowan is a paid consultant with the Correct Care Solutions Hepatitis C Review Committee at DOC. (*Id.* at 4:8-13). Dr. Cowan also testified that he "serve[s] on the Correct Care Solutions Hepatitis C Review Committee." (*Id.* at 67:16-17).

12.    Dr. Cowan testified that there is "not very good concordance between physical symptoms [of hepatitis C] that a patient may experience

5

and their degree of fibrosis or cirrhosis," such that one cannot say at what level of fibrosis or cirrhosis a person will begin to experience physical symptoms related to hepatitis C. (Cowan Test., Dec. 22, 2015 at 207:11-17).

13.    The landscape of treatments for hepatitis C is evolving very rapidly. (*Id.* at 201:8-9).

14.    Sovaldi and Harvoni are DAA medications for the treatment of hepatitis C. Sovaldi was first approved by the Food and Drug Administration in December 2013. Harvoni was first approved in October 2014. (*Id.* at 201:1-6). These drugs have "relative low-risk side effects" and "high success rates of 90 percent plus." (*Id.* at 213:24-214:2).

15.    Dr. Cowan agreed that, on average, "with the new drug, there's a 90 to 95 percent chance that the treatment will be successful." (Cowan Test, Dec. 23, 2015 at 28:5-7; see also Noel Test, Dec. 23, 2015, at 129:10-13 (agreeing that if Plaintiff were treated with direct-acting antivirals, there is a 90 to 95 chance he would be cured of Hepatitis C)).

16.    "The goal of Hepatitis C anti-viral treatment is to achieve a sustained virological response (SVR), defined as undetectable HCV virus in the blood." (Pa. Dep't of Cor., Interim Hepatitis C Protocol, Pl.'s Ex. 30 at ¶ (A)(1)).

17.    "Achieving an SVR may significantly decrease the risk of disease progression and the development of decompensated cirrhosis, liver cancer, liver failure, and death." (*Id.*). Dr. Cowan agreed with the statement that patients cured of HCV infection experience numerous benefits, including a decrease in liver inflammation and a reduction in liver fibrosis. (Cowan Test., Dec. 23, 2015 at 25:19-25). He also agreed with the statement that delay in treatment decreases the benefit of SVR. (*Id.* at 26:4-7). Dr. Cowan further agreed that successful treatment of hepatitis C has been shown to reduce, if not eliminate, fatigue in patients with chronic hepatitis C. (*Id.* at 28:1-4).

18.    The October 2015 guidelines from the American Association for the Study of Liver Diseases ("AASLD") and Infectious Diseases Society of America ("IDSA") entitled "When and in Whom to Initiate HCV Therapy" "recommend treatment [using DAA therapies] for all patients with chronic HCV ["hepatitis C virus"] infection, except those with short life expectancies

6

that cannot be remediated by treating HCV, by transplantation, or by other directed therapy." (Am. Ass'n for the Study of Liver Diseases & Infectious Diseases Soc'y of Am., When and in Whom to Initiate HCV Therapy, Pl.'s Ex. 18 at 1; *see also* Cowan Test., Dec. 23, 2015 at 24:9-14).

19.     The Centers for Disease Control ("CDC") states that the standard of care in hepatitis C treatment in the United States is treatment with direct-acting antiviral agents such as Harvoni and Viekira Pak. (Ctr. for Disease Control, Surveillance for Viral Hepatitis – United States, 2013, Pl.'s Ex. 17 at 5-6). The CDC refers providers caring for hepatitis C-infected patients to the AASLD/IDSA guidance for continuously updated information regarding hepatitis C treatment. (*Id.* at 6).

20.     Dr. Cowan agreed that the CDC points to the AASLD/IDSA guidelines as the standard of care for the treatment of Hepatitis C. (Cowan Test., Dec. 23, 2015 at 33:15-34:9).

21.     Dr. Cowan testified that he agreed that the same standard of care as to hepatitis C treatment that is applicable to the community at large should apply in a correctional setting. (*Id.* at 32:17-20).

22.     Dr. Cowan testified that "[a]t the current time, given the backlog of patients that have this disease, it is [his] recommendation . . . that the sickest patients be treated first. Those are the patients with fibrosis scores of 3 and 4." (*Id.* at 66:19-22).

23.     Dr. Cowan testified "[i]f [a] patient had Chronic Hepatitis C, in private practice, [he] would engage in a conversation with the patient's insurance company and recommend the current AASLD Guidelines" and that, if the patient could pay for it, he would recommend treatment. (*Id.* at 68:7-18).

24.     Dr. Cowan testified that "[t]here is a fiscal component involved" in the determination of who should and should not receive treatment with DAA medications for hepatitis C. (*Id.* at 82:18-25).

25.     Dr. Paul Noel is the Chief of Clinical Services for DOC, a position which he has held since 2014. (Noel Test, Dec. 23, 2015, Doc. 96 at 90:3-7). Dr. Noel has worked in correctional health care in Pennsylvania since 1994. (*Id.* at 90:12-23).

26. Dr. Noel testified that in his role as DOC's Chief of Clinical Services he is "involved with oversight of the medical contract . . . [he is] the point of contact to make sure that the clinical services are appropriate, according to contract, and policies and procedures performed by the medical contractor. [He] deal[s] more directly with [the medical contractor's] corresponding State Medical Director on issues of quality improvement, policies and procedures, things like that." (*Id.* at 91:15-25).

27. Dr. Noel agreed that the most recent AASLD Guidelines on the treatment of hepatitis C recommend treatment for everyone. (*Id.* at 130:16-23).

28. Dr. Noel testified that, with respect to the AASLD Guidelines,

We review them, we take them into consideration, they're part of the big picture, they're not the single bullet that has everything right, it's a much more complicated – it would be nice if we could go to one document and everybody follow it and everything would be wonderful, it just doesn't work that way. So the AASLD has a large voice at the table, if that's your question. We don't necessarily do just what the AASLD says.

(*Id.* at 131:13).

29. Dr. Noel testified that in or about December 2013, DOC ceased administration of then-current medications because "the AASLD made specific recommendations to cease those current medications that we were using. And that's why they were no longer used, so it's not like we had the option to keep doing it." (*Id.* at 133:9-134:1).

## DOC's Interim Hepatitis C Protocol

30. Dr. Noel testified that DOC has an interim protocol to address patients with hepatitis C. (Noel Test., Dec. 23, 2015 at 99:15-22).

31. The interim protocol was issued on November 13, 2015 and effective November 20, 2015. (Pl.'s Ex. 30).

32. Dr. Noel testified that the interim protocol "was formulated to address those patients with Hepatitis C who are in the most need of treatment

8

right away." (Noel Test., Dec. 23, 2015 at 99:24-25). He testified that the policy is "interim" in the sense that it will be adjusted as DOC treats current patients and as science and hepatitis C treatment guidelines in the community and within the prison system evolve. (*Id.* at 99:23-100:9).

33. Dr. Noel testified that the interim protocol replaced a prior hepatitis C protocol, which "was a protocol for medications that are no longer used." (*Id.* at 100:14-25).

34. Dr. Noel was involved in developing the interim protocol and had assisted in developing the previous protocol. (*Id.* at 101:7-13). He also testified that he helped draft the interim protocol. (*Id.* at 126:8-14).

35. The DOC's interim hepatitis C protocol is a "prioritization protocol," which Dr. Noel testified is designed "to identify those with the most serious liver disease and to treat them first, and then, as they're treated, move down the list to the lower priorities, from high priority to lower priority." (*Id.* at 102:17-103:1; see also Pl.'s Ex. 30 at 2 ("The purpose of this Hepatitis C Protocol is to prioritize candidates for anti-viral treatment.")).

36. Dr. Noel testified that the protocol does not preclude hepatitis C treatment from any inmate who has hepatitis C. (Noel. Test., Dec. 23, 2015 at 103:3-7).

37. The protocol defines patients with chronic hepatitis C as those with a documented detectable viral load and includes under this label "all patients on the continuum from no fibrosis -> fibrosis -> compensated cirrhosis -> decompensated cirrhosis." (Pl.'s Ex. 30 at 2).

38. Patients with "Chronic Hepatitis C (Compensated)" are defined by the protocol as those having the presence of "(1) a previous liver biopsy with fibrosis Metavir stage 4 or Ishak stage 6; (2) a Platelet Count of < 100,000/mcL; (3) a Hepatitis C Antiviral Long-term Treatment Against Cirrhosis (HALT-C) probability of >60%; and/or (4) no evidence of jaundice, ascites, bleeding esophageal varices, or hepatic encephalopathy." (Pl.'s Ex. 30 at 2).

39. Patients with "Chronic Hepatitis C (Decompensated)" are defined by the protocol as those that display "evidence of jaundice, ascites, bleeding esophageal varices, or hepatic encephalopathy." (Pl.'s Ex. 30 at 3).

9

40.     According to the protocol, all patients with chronic hepatitis C will be entered into the Liver Disease Chronic Care Clinic and given a diagnosis of "no cirrhosis," "compensated cirrhosis," or "decompensated cirrhosis." (Pl.'s Ex. 30 at 3). Patients with "no cirrhosis" will be seen for a follow-up Clinic appointment every twelve months, patients with "compensated cirrhosis" will be seen for a follow-up every six months, and patients with "decompensated cirrhosis" will be seen for a follow-up every month. (*Id.* at 4).

41.     Dr. Noel testified that inmates with chronic hepatitis C will be "put into the Chronic Care Clinic," which he defined as "a tracking system to ensure that they are seen on a regular basis." According to Dr. Noel's testimony, "[t]he vast majority of them will live in general population and just be followed by one of [the] providers on-site, along with an Infectious Control Nurse . . . ." (Noel Test., Dec. 23, 2015, at 104:16-21).

42.     According to Dr. Noel, "[i]f a patient is absolutely 100 percent asymptomatic, . . . they're seen at least once a year." (*Id.* at 106:1-5). Dr. Noel testified that "[o]nce they start[ ] developing advanced fibrosis or cirrhosis . . . it goes to every six months . . . . And if they're really sick, where they have decompensated cirrhosis and in end stage liver disease, they're seen every month." (*Id.* at 106:7-11). According to Dr. Noel, "[c]linicians can see [patients in the Chronic Care Clinic] more often, as they see fit." (*Id.* at 106:12-14).

43.     According to the interim protocol, "it is most important to identify patients with advanced compensated cirrhosis and early decompensated cirrhosis . . . as the highest priority for anti-viral treatment" because "patients with decompensated cirrhosis are at high risk in drug therapy and their treatment options may be limited to liver transplantation." (Pl.'s Ex. 30 at 5, ¶ 3).

44.     According to the interim protocol, "[t]he population most in need of evaluation will be defined as those with platelet counts below 100,000/mcL and those with HALT-C predicted likelihood of cirrhosis above 60%" and "[t]hese patients will be individually evaluated for prioritization in ascending order of platelet count . . . ." (Pl.'s Ex. 30 at 5, ¶ 5).

45.     The interim protocol states that a patient with either a platelet count below 100,000/mcL or a HALT-C probability of cirrhosis > 60 percent will have an initial review of his or her medical charts only at his or her home site. (*Id.* at 6, ¶ 6). If no medical or administrative exclusionary indications to anti-viral treatment are found at the home site, the correctional Health Care Administrator of the home site will forward a Hepatitis C Treatment Referral Form to the Bureau of Health Care Services Infection Control Coordinator for further evaluation, possible recommendations for further testing, and final determination. (Pl.'s Ex. 30 at 6, ¶ 8).

46.     Dr. Noel testified that if inmates have "a platelet count less of a hundred thousand or a HALT-C score of greater than 60 percent, they would be identified as someone who needs further evaluation" and would then be referred to the Central Office's Hepatitis C Review Committee. (Noel Test., Dec. 23, 2015, at 104:23-105:4).

47.     According to the interim protocol, the Hepatitis C Treatment Committee consists of at least four people: Dr. Noel, as the DOC's Bureau of Health Care Services Chief of Clinical Services; the Bureau of Health Care Services Assistant Medical Director; the Statewide Medical Director for Correct Care Solutions; and the Bureau of Health Care Services Infection Control Coordinator. (Pl.'s Ex. 30 at 7, ¶ 1). Dr. Noel testified that the Committee consists of himself, as "the Chief of Clinical Services, the representative from the medical contractor CSS, Infectious Control nurse, the Assistant Medical Director for the DOC, and anyone [the Committee] might invite to participate in any difficult cases." (Noel Test., Dec. 23, 2015 at 129:22-130:1).

48.     The individual's clinical status will be reviewed by the Hepatitis C Treatment Committee for prioritization for treatment with DAA medications. (Pl.'s Ex. 30 at 7, ¶ 1). According to Dr. Noel's testimony, the Review Committee would then "sit down and manually go through the patient's chart with some information provided by the site, possibly, a phone conference with the Site Medical Director" and a "determination then would be made if there was some further testing or further evaluation that needed to be done." (Noel Test., Dec. 23, 2015 at 105:5-11).

49.     According to the protocol, if upon review the Committee determines the patient is a candidate for treatment with DAA medication, an esophageal gastroendoscopy ("EGD") will be approved to evaluate the patient

for esophageal varices. (Pl.'s Ex. 30 at 7, ¶ 2). According to Dr. Noel, under the current protocol, the Review Committee makes "a decision of whether or not to refer and schedule a patient for . . . an EGD," and, if so referred, the inmate would be sent off site to "have an EGD performed to determine whether or not they have esophageal varices." (Noel Test., Dec. 23, 2015, at 105:12-17).

50.    According to the protocol, if the endoscopy documents the presence of esophageal varices, the patient will be approved for referral to a supervising physician – that is, a physician licensed in Pennsylvania and experienced in the treatment of Hepatitis C utilizing the most current medications who will treat the patient via telemedicine. (Pl.'s Ex. 30 at 7, ¶¶ 3, 5). Dr. Noel testified that "[e]sophageal varices are a direct indication of portal hypertension and correlates with those [patients] with the most severe disease that need treatment immediately, [and] those with esophageal varices would then be referred for treatment." (Noel Test., Dec. 23, 2015, at 105:18-21).

51.    According to the protocol, if the EGD results show no esophageal varices, the case will be returned to the home site for regular follow-up in the Chronic Care Clinic with a recommendation for repeat EGD in two to three years. (Pl.'s Ex. 30 at 7, ¶ 3).

52. Dr. Noel testified that "when you have esophageal varices, there's a certain pressure in the portal hypertension, and that pressure then correlates into the severity of the disease". (Noel Test., Dec. 23, 2015, at 112:6-8). Dr. Noel described the significance of esophageal varices as follows:

. . . when they have esophageal varices, they pass a certain threshold into advanced disease, and not only is there an indication of advanced disease, but those who actually have esophageal varices are at risk for the varices rupturing and having a severe and critical bleed, because they're [sic] platelet counts are low, so they don't clot very well, and you could have a catastrophe.

So if we identify those with esophageal varices, not only do we have someone who has advanced disease, the Hepatitis C, would be most appropriate for, we can also have them band the

12

esophageal varices so they don't have a bleed and a catastrophic event.

(*Id.* at 112:10-23).

53. Dr. Noel testified that if inmates are found to "have varices, they move on to immediate treatment, and if they don't have varices, they can wait." (*Id.* at 128:25-129:2).

54. Dr. Noel agreed with the statement that "before treatment is even considered by the DOC, a person has a diagnosis of cirrhosis." (*Id.* at 129:6-8).

### Plaintiff's Medical Conditions and Health

55. Plaintiff testified that he "feel[s] better than [he] had" and that the condition of his skin had "changed for the better" between September 2015 and the evidentiary hearing in December 2015. (Abu-Jamal Test., Dec. 18, 2015, Doc. 94 at 82:11-15, 95:22).

56. Plaintiff's expert witness Dr. Joseph Harris, a board-certified internist who sees, among others, patients with hepatitis C, testified that, in his opinion, Plaintiff's skin condition is secondary to his hepatitis C and that it is "probably" a condition called necrolytic acral erythema ("NAE"). (Harris Test, Dec. 18, 2015, Doc. 94 at 105:19-106:21, 135:17-25). Dr. Harris testified that hepatitis C can also cause the skin conditions psoriasis and eczema. (*Id.* at 137:13-20).

57. Dr. Harris testified that the way to treat NAE is to "[t]reat the Hepatitis C" and that the fact that Plaintiff's skin condition has not fully resolved after extensive treatment speaks strongly for the condition being "either [NAE] or some condition that's predicated on the Hepatitis C that's not going to get better without treatment of Hepatitis C." (*Id.* at 137:9-12, 144:21-145:12).

58. Dr. Harris testified that, in his opinion, Plaintiff is likely to have about a Metavir score of F2 or 2.5. (Harris Test, Dec. 22, 2015, Doc. 95 at 21:19-22:6).

59.     The DOC Defendants' expert witness Dr. Stephen Schleicher, a board-certified dermatologist, testified that, in his opinion, Plaintiff's skin condition is a cross between psoriasis and eczema. (Schleicher Test., Dec. 22, 2015, Doc. 95 at 59:18-19, 70:4-13).

60.     When asked if he would be surprised to learn that the CDC recommends treatment with antiviral medication to everyone with an active chronic hepatitis C infection, Dr. Schleicher testified as follows:

> A: I can't say I'm either surprised or not surprised. It's not my field, and I don't know what the current thinking is and what defines an active infection. You know, unfortunately, it's beyond my expertise.
>
> Q: Basically, you don't know much about Hepatitis C is what you're saying?
>
> A: Hepatitis C, as far as treatment goes, no, I can say, being a dermatologist, no, that's true.

(*Id.* at 112:4-14).

61.     Dr. Cowan and Dr. Noel agree that Plaintiff has chronic Hepatitis C. (Cowan Test, Dec. 22, 2015 at 218:24-219:1; Noel Test, Dec. 23, 2015 at 123:14-16).

62.     Dr. Noel testified that the Hepatitis C Treatment Committee made the decision not to give Plaintiff the direct-acting antiviral medication he has requested. (Noel Test., Dec. 23, 2015 at 129:14-18).

63.     Dr. Noel testified that the Hepatitis C Treatment Committee has the ultimate authority to decide whether Plaintiff receives DAA medication. (*Id.* at 129:18-21).

64.     Upon review of Plaintiff's case, the Hepatitis C Committee determined that Plaintiff "did not have cirrhosis or vast fibrosis and, therefore, he was excluded from current treatment, based on his liver condition." (*Id.* at 120:23-7). Dr. Noel testified that Plaintiff will be reviewed again in the future. (*Id.* at 121:8-11).

14

65.    If Plaintiff were given DAA treatment, Dr. Noel testified that Plaintiff would be "jumping line, whoever is lower down will have to wait longer." (*Id.* at 122:14-19).

66.    When asked if there is any medical reason why Plaintiff should not be administered direct-acting antiviral medication, Dr. Noel testified as follows:

> [o]ff the top of my head, I can think of no medical contraindications at this time. The only caveat I would say is if someone were to get treatment, we always present them to a gastroenterologist for final decision on that. But, no, I have no medical exclusions.

(*Id.* at 154:8-15).

67.    Dr. Cowan agreed that if Plaintiff is treated with DAA medication, it is almost certain, although not absolutely certain, that he would avoid further progression of his hepatitis C disease. (Cowan Test., Dec. 23, 2015 at 23:10-13).

68.    Dr. Noel agreed that Plaintiff has a Metavir score of F2, which means that his liver is scarred. (Noel Test., Dec. 23, 2015 at 123:17-20). Dr. Noel also testified that Plaintiff has "some liver disease." (Noel Test., Dec. 23, 2015 at 147:3-8).

*Abu-Jamal v. Kerestes*, 2016 WL 4574646, at *2-*9. Additionally, the Court makes the

following findings of facts:

69.    The interim policy was in effect from November 20, 2015, to November 7,

2016. (Docs. 8-15, 18-1).

70.    As of June 6, 2016, out of the estimated 5,426 inmates in the DOC system

with chronic hepatitis C, twelve had completed treatment with DAA medications and thirty-

eight more were receiving DAA medications. (Doc. 8-16, ¶3).

## Hepatitis C Protocol

71.    On November 7, 2016, the DOC issued a new protocol for addressing inmates with hepatitis C. (Doc. 18-1). That protocol became effective on November 7, 2016. (*Id.*).

72.    Under the current protocol, inmates are screened for Hepatitis C and those who test positive are tested for a measurable viral load to determine if they have chronic hepatitis C. (*Id.* at 1).

73.    The Aspartate Aminotransferase to Platelet Ratio Index (APRI) score is used to predict the presence of cirrhosis.[5] (*Id.* at 2). "An APRI score ≥ 2.0 may be used to predict the presence of cirrhosis," although "[a] single APRI score should not be used in isolation." (*Id.*).

74.    Inmates with chronic hepatitis C will be given a diagnosis of F0 to F4, with F0 being no fibrosis, F1 being mild fibrosis, F2 being moderate fibrosis, F3 being advanced fibrosis, and F4 being cirrhosis. (*Id.* at 4). Additionally, inmates with "chronic Hepatitis C . . . will be entered into the Liver Disease Chronic Care Clinic." (*Id.*).

75.    Inmates will be seen in the clinic periodically according to their diagnosis as follows: F0-F2, every six months, F3, every three months, and F4, every month. (*Id.* at 6).

76.    According to the protocol "[a]lthough all patients with chronic [hepatitis C] infection may benefit from treatment, certain cases are at higher risk for complications or

_____

[5] Use of the APRI score has replaced use of the HALT-C score. (Doc. 18 at 9).

16

disease progression and require more urgent consideration for treatment." (*Id.*). Thus, the protocol adopts the Federal Bureau of Prisons Priority Criteria[6] and uses such "priority criteria to ensure that those with the greatest need are identified and treated first." (*Id.*).

77.    The protocol classifies inmates into one of four priority categories: Priority Level 1 – Highest Priority for Treatment, Priority Level 2 – High Priority for Treatment, Priority Level 3 – Intermediate Priority for Treatment, and Priority Level 4 – Routine Priority for Treatment. (*Id.* at 7-8).

78.    Priority Level 1 includes inmates with cirrhosis (except that an inmate with an isolated APRI score of ≥ 2.0 is placed in Priority Level 2), hepatocellular carcinoma, comorbid medical conditions associated with hepatitis C, a certain type of chronic kidney disease, those taking immunosuppressant medication for a comorbid medical condition, and/or those who have already begun taking DAA medications. (*Id.*). Priority Level 1 also includes inmates who are liver transplant candidates or recipients. (*Id.* at 7). Priority Level 2 includes those with an APRI score ≥ 2, advanced fibrosis on a liver biopsy, hepatitis B or HIV coinfections, comorbid liver diseases, and/or types of chronic kidney disease. (*Id.* at 8). Priority Level 3 includes inmates with an F2 diagnosis on a liver biopsy, an APRI score of

---

[6] The DOC policy adopts the April 2016 Federal Bureau of Prisons Priority Criteria. (Doc. 18-1, H.1). In October of 2016, before the DOC policy was issued, the Federal Bureau of Prisons revised its policy. *See Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection,* FED. BUREAU OF PRISONS (Oct. 2016), https://www.bop.gov/resources/pdfs/hepatitis_c.pdf. The April 2016 Federal Bureau of Prisons Priority Criteria, which contained four priority categories, was "revised and condensed into three categories: high, intermediate, and low priority." *Id.* at i.

1.5 to < 2, diabetes mellitus, and/or porphyria cutanea tarda. (*Id.*). Priority Level 4 includes

those with a F0 or F1 diagnosis on a liver biopsy. (*Id.*).

79. The protocol dictates that an initial screening for treatment with DAA

medications will occur for those inmates with an APRI score > 1.5 or a platelet count <

100,000 and will consist of the Correctional Health Care Administrator (CHCA), Infection

Control Nurse, and Site Medical Director reviewing the inmate's medical chart to "look for

the presence of any [of the enumerated] exclusionary indications." (*Id.* at 9). "If the CHCA

determines that there are no exclusionary indications to anti-viral treatment, [a referral form]

shall be forwarded to the [Bureau of Health Care Services Infection Control Coordinator] for

further evaluation, possible recommendations for further testing, and initial determination."

(*Id.*).

80. Further, the protocol states as follows:

The PA DOC has determined that there is no single method of prioritizing
patients for treatment with anti-viral medications. Therefore, the patient's
clinical status will be reviewed by a Hepatitis C Treatment Committee . . . .

The Committee will utilize the pertinent information available to determine if
continued progression through the evaluation process is indicated. . . . If the
patient is considered a candidate for treatment with anti-viral medication,
shear wave elastography will be approved to document the stage of
fibrosis/cirrhosis.

If the patient meets any of the criteria designated Priority Level 1 - Highest
Priority for Treatment . . . proceed with the following:
   a. full ultrasound screening for HCC every six months;
   b. EGO for esophageal varices surveillance;
   c. refer to Supervisory Physician for final review and the ordering of DAA
      medications unless there are contraindications; and

18

d. follow in Chronic Care Clinic every month.

For those patients approved for elastography, the results will be forwarded to the Committee for review.
    a. Fibrosis Stage 0-2
        (1) Repeat Elastography in two years.
        (2) Follow in Chronic Care Clinic every six months.
    b. Fibrosis Stage 3
        (1) Refer to the Supervising Physician for final review and the ordering of DAA medications unless there are contraindications.
        (2) Follow in Chronic Care Clinic every three months.
    c. Fibrosis Stage 4
        (1) Full ultrasound screening for HCC every six months.
        (2) EGO for esophageal varices surveillance.
        (3) Refer to the Supervising Physician for final review and the ordering of DAA medications unless there are contraindications.
        (4) Follow in Chronic Care Clinic every month.

The Committee will render its decision and forward the determination, along with follow-up recommendations for those not meeting current priority criteria for greatest need of treatment with anti-viral medications, to the ICN and Site Medical Director, who will then discuss the results with the patient . . . .

If the Committee recommends treatment with anti-viral medication, the Site Medical Director will refer the patient to a supervising physician who will direct the anti-viral treatment.

(*Id.* at 10-11).

### III. Conclusions of Law

Because the Court is relying on many of the same facts as it did in *Abu-Jamal 1*, the

Court adopts the following conclusions of law from *Abu-Jamal v. Kerestes*:

    1.    Plaintiff has chronic hepatitis C.

19

2.      The standard of care with respect to the treatment of chronic Hepatitis C is the administration of newly-developed DAA medications, such as Harvoni, Sovaldi, and Viekira Pak.

. . .

[3].     It was the Hepatitis C Treatment Committee who made the decision not to give Plaintiff DAA medications and that had, and continues to have, the ultimate authority to determine whether or not Plaintiff will receive the DAA medications that offer him at least a 90 to 95 percent chance of attaining SVR — that is, of being cured of hepatitis C.

*Abu-Jamal v. Kerestes*, 2016 WL 4574646, at *9. Additionally, the Court makes the

following conclusions of law:

4.      Chronic hepatitis C constitutes a serious medical need.

5.      The Hepatitis C Protocol, in both how it is written and how it is

implemented, bars those without vast fibrosis or cirrhosis from being approved for

treatment with DAA medications.  As such, the Hepatitis C Protocol presents a

conscious disregard of a known risk that inmates with fibrosis, like Plaintiff, will suffer

from hepatitis C related complications, continued liver scarring and damage

progressing into cirrhosis, and from cirrhosis related complications such as ascites,

portal hypertension, hepatic encephalopathy, and esophageal varices.

6.      The Hepatitis C Protocol deliberately delays treatment for hepatitis C

through the administration of DAA drugs such as Harvoni, Sovaldi, and Viekira Pak

despite the knowledge of Defendants that sit on the Hepatitis C Treatment

Committee: (1) that the aforesaid DAA medications will effect a cure of Hepatitis C in

20

90 to 95 percent of the cases of that disease; and (2) that the substantial delay in treatment that is inherent in the current protocol is likely to reduce the efficacy of these medications and thereby prolong the suffering of those who have been diagnosed with chronic hepatitis C and allow the progression of the disease to accelerate so that it presents a greater threat of cirrhosis, hepatocellular carcinoma, and death of the inmate with such disease.

7.      Plaintiff was denied the treatment with DAA medications pursuant to DOC policy, not because of any medical exclusions.

8.      The named Defendants who sit on the Hepatitis C Treatment Committee deliberately denied administering DAA drugs to Plaintiff despite knowing that administering such drugs was the standard of care.  In choosing a course of monitoring over treatment, they consciously disregarded the known risks of Plaintiff's serious medical needs, namely continued liver scarring, disease progression, and other hepatitis C complications.

## IV. STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. In ruling on a motion for a preliminary injunction, the Court must consider: "'(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving

party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'"[7]

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir.

2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)).

Although the moving party bears the burden to show its entitlement to the requested relief,

"each factor need not be established beyond doubt." *Stilp v. Contino*, 629 F. Supp. 2d 449,

457 (M.D. Pa. 2009), *aff'd and remanded*, 613 F.3d 405 (3d Cir. 2010).

"[W]here the relief ordered by the preliminary injunction is mandatory and will alter

the status quo, the party seeking the injunction must meet a higher standard of showing

irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St Croix*

*Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008) (citing *Tom Doherty Assocs., Inc.*

*v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995)). Furthermore, federal law specifies

that in civil actions challenging prison conditions, to the extent preliminary injunctive relief is

granted, it "must be narrowly drawn, extend no further than necessary to correct the harm

the court finds requires preliminary relief, and be the least intrusive means necessary to

correct that harm." 18 U.S.C. § 3626(a)(2). Additionally, "[t]he court shall give substantial

weight to any adverse impact on public safety or the operation of a criminal justice system

caused by the preliminary relief . . . ." *Id.*

---

[7] The Third Circuit has also characterized the first factor as whether the moving party has demonstrated "a reasonable probability of success on the merits." *McTernan v. City of York, Pa.*, 577 F.3d 521, 526 (3d Cir. 2009) (internal citation and quotation marks omitted).

## V. ANALYSIS

As a preliminary matter, Defendants argue that this Court should deny Plaintiff's request for injunctive relief pursuant to the "first-filed rule." While the Court finds the first-filed rule does not bar the present action, it will briefly address the merits of this argument before turning to the preliminary injunction analysis.

### A. First-Filed Rule

At the outset, Defendants argue that this action is duplicative of *Abu-Jamal 1*, and the Court should therefore dismiss the current action pursuant to the "first-filed rule." (Doc. 18 at 6). Plaintiff argues that the rule does not apply because (1) this action and *Abu-Jamal 1* are pending in the same court and thus do not raise any of the issues the first-filed rule was created to prevent, (2) this action and *Abu-Jamal 1* are not truly duplicative and therefore the first-filed rule is inapplicable, and (3) even if the rule was applicable, it should not be applied because it would prejudice Plaintiff. (Doc. 20 at 1-4).

Under the first-filed rule "[i]n all cases of [federal] concurrent jurisdiction, the court which first has possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941) (quotation omitted). "[T]his policy of comity has served to counsel trial judges to exercise their discretion by enjoining the subsequent prosecution of 'similar cases . . . in different federal district courts.'" *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988) (alteration original) (quoting *Compagne des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877, 887 n.10 (3d Cir. 1981)). "The first-filed rule encourages

sound judicial administration and promotes comity among federal courts of equal rank. It gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *Id.*

In order for the rule to apply, "the later-filed case must be truly duplicative of the suit before the court. That is, the one must be materially on all fours with the other. The issues must have such an identity that a determination in one action leaves little or nothing to be determined in the other." *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 333 n.6 (3d Cir. 2007) (alterations, internal citations, and quotations omitted). Even when the rule applies, however, the power to enjoin actions "is not a mandate directing wooden application of the rule without regard to rare or extraordinary circumstances, inequitable conduct, bad faith, or forum shopping. District courts have always had discretion to retain jurisdiction given appropriate circumstances justifying departure from the first-filed rule." *E.E.O.C.*, 850 F.2d at 972.

Here, the simple matter is that the two actions are not identical. Although the claim in this action is identical to one of the claims in *Abu-Jamal 1*, the majority of Defendants in this action are different than the Defendants in *Abu-Jamal 1*.[8] *See Complaint of Bankers Trust Co. v. Chatterjee*, 636 F.2d 37, 40 (3d Cir. 1980) (stating that "[w]hen the claims, parties, or requested relief differ" application of the rule may not be appropriate). Further, a

---

[8] Defendants incorrectly assert that "[b]oth actions have three mutual Defendants, namely Wetzel, Silva, and Noel." (Doc. 18 at 7). Although Plaintiff has moved to amend his complaint in *Abu-Jamal 1* to add Defendants Wetzel and Noel, that motion is still pending before this Court. Thus, both actions have only one defendant currently in common: Joseph Silva.

decision in this case would not result in "little or nothing to be determined in" *Abu-Jamal 1*. See *Grider*, 500 F.3d at 333 n.6. Indeed, there are a variety of other matters to be decided in *Abu-Jamal 1*.

Defendants, as they must, concede that these two actions are not identical. (Doc. 18 at 7). Nevertheless, they argue that "[i]t is of no matter that the defendants and claims are not identical because Plaintiff has re-asserted the identical claim of deliberate indifference that arises out of the same 'nucleus of operative facts' as the claims upon which [*Abu-Jamal 1*] is based." (*Id.*). Defendants cite *Ball v. D'Addio*, 2012 WL 3598412 (M.D. Pa 2012), for the proposition that, under the first-filed rule, a court may dismiss a suit "where [Plaintiff] filed the same claim in successive, but separate, lawsuits before" the same court. 2012 WL 3598412, at *7. *Ball*, however, involved a serial pro-se litigator with a "history of repeated, frivolous and meritless litigation" who had twenty-five pending lawsuits before the same court. *Id.* at *1. The claim in *Ball* "was legally identical and factually related to an earlier claim brought by [Plaintiff] against this *same Defendant* in a prior lawsuit." *Id.* at *3 (emphasis added). Conversely, Plaintiff here initially filed this claim in *Abu-Jamal 1*. After being told by this Court that he had sued the wrong people, Plaintiff filed the present action against the proper Defendants. Thus, *Ball*'s application of the first-filed rule to subsequent identical claims brought by the same Plaintiff against the *same Defendants* in the same court is not applicable to the case at hand.

25

Nevertheless, even if the first-filed rule was applicable under these facts, the Court has good cause to decline to exercise its discretion to enjoin. First, this case presents the type of "appropriate circumstances" that merit "departure from the first-filed rule." *See E.E.O.C.*, 850 F.2d at 972. First, the spirit of the rule is not violated here. Indeed, in addition to comity, "the rule's primary purpose is to avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments." *Id.* at 977. The two cases at issue here appear before the same court. Thus, there is no risk that this Court will interfere with another court's affairs or that these two cases will produce conflicting results.

Second, as this Court recognized in *Abu-Jamal v. Kerestes*, the questions raised in this motion for a preliminary injunction are "deserving of treatment and resolution at the level of the circuit courts or above." 2016 WL 4574646, at *14. As this Court has no doubt that its decision in this case will be appealed, extracting this single claim away from the multiple other claims presented in *Abu-Jamal 1*—with its lengthy and complicated record—will aid appellate review of this matter by presenting it in a cleaner and simpler format.

In sum, while the Court finds the first-filed rule inapplicable under these facts, even if it did apply, the Court would decline to exercise its discretion to enjoin under that rule.

## B. Preliminary Injunction

As outlined above, to resolve this motion the Court must consider: "'(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving

party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'"

*McNeil Nutritionals, LLC*, 511 F.3d at 356-57 (quoting *Shire U.S. Inc.,* 329 F.3d at 352).

Although Defendants only challenge the first factor, the Court will address each in turn.

*1. The likelihood of success on the merits.*

Under the Eighth Amendment, made applicable to the states by the Fourteenth

Amendment, a state must "provide medical care for those whom it is punishing by

incarceration." *Estelle v. Gamble*, 429 U.S. 97, 101, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251

(1976). To make out a claim under the Eighth Amendment for failure to provide adequate

medical care, a "plaintiff[ ] must demonstrate (1) that the defendants were deliberately

indifferent to [his or her] medical needs and (2) that those needs were serious." *Rouse v.*

*Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Addressing the second prong first, a serious

medical need "is 'one that has been diagnosed by a physician as requiring treatment or one

that is so obvious that a lay person would easily recognize the necessity for a doctor's

attention.'" *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)

(quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979), *aff'd*, 649 F.2d 860 (3d

Cir.1981)). Further, "[t]he seriousness of an inmate's medical need may also be determined

by reference to the effect of denying the particular treatment." *Id.*

Here, there can be no doubt that Plaintiff has chronic hepatitis C. Dr. Cowan, the

DOC's expert witness, and Dr. Noel, one of the defendants in this case, both testified that

Plaintiff has chronic hepatitis C. (Cowan Test, Dec. 22, 2015 at 218:24-219:1; Noel Test,

Dec. 23, 2015 at 123:14-16). Dr. Cowan also testified that he agreed that chronic hepatitis C is a serious disease, that it is the number one cause for liver transplants in the United States, and that it is the number one cause of liver disease in the United States. (Cowan Test, Dec. 23, 2015 at 20:17-19, 21:22-22:2). According to the DOC's Interim Hepatitis C Protocol, treatment of hepatitis C "may significantly decrease the risk of disease progression and the development of decompensated cirrhosis, liver cancer, liver failure, and death." (Doc. 18-15 at 1). Further, both the AASLD and the CDC recommend treatment for someone with Plaintiff's condition. (*See* Findings of Fact, *supra*, ¶¶ 18-19). Thus, given that (1) Plaintiff has chronic hepatitis C, (2) the DOC's expert testified that chronic hepatitis C is a serious disease that leads to serious medical complications when left untreated, (3) the DOC's prior protocol recognized the risk of non-treatment, and (4) the AASLD and CDC recommend treatment for someone with Plaintiff's condition, the Court finds that Plaintiff's has a reasonable likelihood of showing that chronic hepatitis C constitutes a serious medical need under the Eighth Amendment.[9]

Turning back to the first prong, this Court must now address whether Defendants' response to Plaintiff's serious medical need constitutes deliberate indifference. Deliberate indifference is akin to "recklessness as that term is defined in criminal law." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). It "requires proof that the [prison] official 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.*

---

[9] Defendants make no argument that Plaintiff's chronic hepatitis C is not a serious medical need.

(quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 62 L. Ed. 2d 811 (1994)). The defendant "must be 'both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . draw the inference.'" *Id.* (alterations original) (quoting *Farmer*, 511 U.S. at 837). "[S]imple medical malpractice is insufficient to present a constitutional violation." *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). Nor do "mere disagreements over medical judgment . . . state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990).

When a court evaluates an Eighth Amendment claim, "prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67. Nevertheless, the Third Circuit has "found 'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197. "Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates." *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 (quotations and alteration omitted). Finally, "[p]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." *Id.* (quotation omitted).

29

Here, Plaintiff has a reasonable likelihood of success in showing that Defendants acted with deliberate indifference to Plaintiff's chronic hepatitis C. Simply put, Defendants, pursuant to DOC policy, deliberately chose a course of monitoring over treatment for non-medical reasons and are allowing Plaintiff's condition to worsen while his liver function and his health continues to deteriorate. In *Abu-Jamal v. Kerestes*, this Court found that the DOC's interim protocol "delays treatment until an inmate's liver is sufficiently cirrhotic that a gastroenterologist determines, at the end of a lengthy, multi-step evaluation procedure taking place over a long period of time, that inmate has esophageal varices." 2016 WL 4574646, at *13. Thus, the Court concluded that

the effect of the protocol is to delay administration of DAA medications until the inmate faces the imminent prospect of "catastrophic" rupture and bleeding out of the esophageal vessels. Additionally, by denying treatment until inmates have "advanced disease" as marked by esophageal varices, the interim protocol prolongs the suffering of those who have been diagnosed with chronic Hepatitis C and allows the progression of the disease to accelerate so that it presents a greater threat of cirrhosis, hepatocellular carcinoma, and death of the inmate with such disease.

*Id.* Here, Defendants seem to argue that the same conclusion is not warranted in light of the DOC's new protocol that has replaced the interim protocol. (Doc. 18 at 8-9). The Court, however, after careful review of the current DOC protocol, finds that a core aspect of the interim protocol that led the Court to the above stated conclusion is still present in the DOC's current protocol.

As discussed above, the standard of care as established by the CDC and AASLD for treatment of patients with hepatitis C is the use of DAA medications. The DOC's own

expert, Dr. Cowan, agreed that the same standard of care as to hepatitis C treatment that is

applicable to the community at large should apply in a correctional setting. (Cowan Test.,

Dec. 23, 2015, at 32:17-20). Thus, the standard of care for treating Plaintiff is to administer

DAA medications such as Harvoni, Sovaldi, and Viekira Pak.

The DOC's interim protocol was a "prioritization protocol," meaning that it prioritized

inmates so that those in most need of the medications would receive it first. (Noel Test.,

Dec. 23, 2015, at 102:17-103:1). Simply prioritizing treatment so that those in the greatest

need are treated first likely would not constitute a constitutional violation. The DOC's

interim protocol, however, went one step further. The protocol stated

> [i]f the patient is considered a candidate for treatment with anti-viral
> medication, an EGD will be approved to evaluate the patient for esophageal
> varices.
>
> The results of the endoscopy will be forwarded to the Committee for review. If
> there are no esophageal varices, the case will be returned to the site for
> regular follow up in the Chronic Care Clinic with a recommendation for repeat
> EGD in two to three years. If the endoscopy documents the presence of
> esophageal varices, the patient will be approved for referral to a supervising
> physician.

(Doc. 8-15 at 7). Dr. Noel, who sits on the Hepatitis C Treatment Committee and is a

defendant in this action, testified that if inmates are found to "have varices, they move on to

immediate treatment, and if they don't have varices, they can wait." (Noel Test., Dec. 23,

2015, at 128:25-129:2). He went on to indicate that, under the interim protocol, an inmate

needed to have cirrhosis before even being considered for treatment. (Id. at 129:6-8).

Thus, there was a requirement that an inmate's hepatitis C be in an advanced stage before

31

Defendants would even consider treatment. This was in spite of the fact that (1) the standard of care is to administer DAA medications regardless of the disease's stage, (2) inmates would likely suffer from hepatitis C complications during that time, and (3) the delay in treatment reduced the efficacy of the DAA medications.

The new protocol implemented by the DOC is also a prioritization protocol because it classifies inmates into different priority levels for treatment. (Doc. 18-1 at 7-8). Much like the interim protocol, however, the new protocol completely bars those with chronic hepatitis C but without vast fibrosis or cirrhosis from receiving DAA medications. Upon review by the Committee, if an inmate is considered for treatment with DAA medications, the Committee orders shear wave elastography to determine the inmate's fibrosis level. (*Id.* at 10). Upon the results of that test, if the inmate has a fibrosis level of F0, F1, or F2, the protocol instructs the Committee to order monitoring but not treatment with DAA medications. (*Id.* at 11). Thus, those with mild or moderate fibrosis have no chance of receiving DAA medications—the standard of care—and the protocol requires their hepatitis C to worsen before they will be considered for treatment.

In addition, the policy does not ensure that those with vast fibrosis or cirrhosis—and who do not have any contraindications—will definitely receive DAA medications. Instead, the Hepatitis C Treatment Committee must still recommend treatment with DAA medications after determining whether the inmate meets "current priority criteria for greatest need of treatment." (Doc. 18-1 at 11).

In Plaintiff's case, he has a fibrosis level of F2 or F2.5, meaning his liver is scarred. (Noel Test., Dec. 23, 2015, at 123:17-20; Harris Test., Dec. 22, 2015, at 21:19-22:6). According to Dr. Noel, Plaintiff likely has some liver damage. (Noel Test., Dec. 23, 2015, at 147:3-8). Dr. Noel also testified that, when the Hepatitis C Treatment Committee reviewed Plaintiff's case, he was denied DAA medications because he "did not have cirrhosis or vast fibrosis." (Id. at 120:23-121:7). Dr. Noel, however, could think of no medical reason why Plaintiff should not receive DAA medications. (Id. at 154:8-15). In effect, Plaintiff was denied DAA medications because his hepatitis C was not advanced enough under the DOC interim protocol, not because of any medical reason why he should not receive treatment.[10] Further, there is no indication that under the current DOC protocol Plaintiff would receive DAA medications.

Therefore, while the Defendants are correct that there is a new hepatitis C protocol in place that is somewhat different than the Interim Hepatitis C Protocol, (Doc. 18 at 9), the new protocol suffers from the same fatal flaw as the interim protocol: it refuses, without medical justification, to provide treatment for certain inmates with hepatitis C and also

---

[10] The Court recognizes the counterargument to this point is that the Defendants' decision that Plaintiff's condition is not advanced enough to require medication is itself a medical basis for not providing him DAA medications. Stated otherwise, Defendants, in their medical opinions, determined that Plaintiff's medical condition was not one that warrants treatment yet. This argument, however, is misleading. As Dr. Noel testified, the purpose of a prioritization protocol is "to identify those with the most serious liver disease and to treat them first, and then, as they're treated, move down the list to the lower priorities, from high priority to lower priority." (Noel. Test. Dec. 23, 2015, at 102:17-103:1). This would conceivably continue until all inmates with hepatitis C are treated. Thus, it is not Plaintiff's medical status that is driving the decision—as it would be, for example, if the risk of medication side effects outweighed the risks presented by the disease at its current stage.

imposes an unreasonable condition—having vast fibrosis or cirrhosis—on treatment.[11]

"[O]utright refusal of any treatment for a degenerative condition that tends to cause acute

infection and pain if left untreated and [ ] imposition of a seriously unreasonable condition on

such treatment, both constitute deliberate indifference on the part of prison officials."

*Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000).

Defendants next argue that Plaintiff cannot establish deliberate indifference because

every court that has addressed this issue has found "that monitoring and treatment under

prioritization protocols is sufficient for Eighth Amendment purposes." (Doc. 18 at 12). In

support of this argument, Defendants cite fourteen cases from across the country that

address, in one way or another, an inmate's contention that they should receive DAA

medications for his or her hepatitis C.[12] (*Id.* at 12-14). Upon review of the case law cited by

---

[11] The Court, however, cautions that simply removing the language in the protocol that bars treatment of inmates whose hepatitis C has not progressed to a certain advanced state would not necessarily resolve the issue. If the DOC removed this bar in the protocol, but only those inmates with the most advanced hepatitis C received DAA medications in practice, the same problem would persist. For example, within the first six months of implementing the interim protocol, only 50 inmates out of the over 5,000 with chronic hepatitis C—less than 1%— received any DAA medications. (Doc. 8-16, ¶ 3). If that trend continues it would likely mean that inmates without vast fibrosis or cirrhosis would have no prospect of actually receiving DAA medications, regardless of the way the prioritization protocol was written.

[12] While there is a body of case law that developed before the availability of the current DAA medications which addressed a prisoner's rights to hepatitis C medication, Defendants wisely do not rely on it. Those cases are all readably distinguishable, as the prior hepatitis C

> treatment ha[d] serious potential side-effects, including nausea, anemia, depression, and decomposition of the liver. Its success rate [was] relatively low—15–30% for regular interferon and 40–50% for pegylated interferon treatment. The selection of patients for interferon treatment [was] highly individualized and depend[ed] upon many factors. Treatment [was] not appropriate for patients with advanced liver problems such as cirrhosis. Treatment for patients with mild liver problems may [have been] safely deferred. Suitability for treatment [was] determined by measuring the degree of liver inflammation and fibrosis through a liver biopsy. However, even if the appropriate threshold levels of

Defendants and for the reasons set out below, this Court is not persuaded that any of the case law foreclose a finding of deliberate indifference in this action.

First, a couple of the cases cited by Defendants are inapplicable based on the procedural posture in which they were presented to those courts. *See Banks v. Gore*, 2016 U.S. Dist. LEXIS 73468, at *12 (E.D. Va. 2016) (dismissing due to lack of jurisdiction because the plaintiff failed to exhaust his administrative remedies);[13] *Melendez v. Fla. Dep't of Corrs.*, 2016 WL 5539781, at *7 (N.D. Fla. 2016) (dismissing a complaint because the pro se plaintiff did not pay the filing fee and his medical condition did not constitute an "imminent danger of serious physical injury" which would enable him to proceed *in forma pauperis* under 28 U.S.C. § 1915(g)), *report and recommendation adopted*, 2016 WL 5661012 (N.D. Fla. 2016).

---

inflammation and fibrosis [were] present, treatment may [have been] inappropriate if the patient [was] too young or too old, had a previous organ transplant, or suffer[ed] from depression, other mental health problems, heart disease, or untreated chemical dependency.

*Bender v. Regier*, 385 F.3d 1133, 1135 (8th Cir. 2004). Thus, "[t]he decision whether or not to use [prior] antiviral therap[ies] [was] a complex and controversial one." *Moore v. Bennett*, 777 F. Supp. 2d 969, 976 (W.D.N.C. 2011). In contrast, the new DAA medications have "relative low-risk side effects," "high success rates of 90 percent plus," (Cowan Test., Dec. 22, 2015, at 213:24-214:2), and are recommended for most individuals with hepatitis C. (*See* Findings of Fact, *supra*, ¶¶ 18-21).

[13] In dicta, after the court found that it lacked jurisdiction, the court went on to analyze the merits of the claim. The entire analysis is as follows:

Even if plaintiff's claims had been properly exhausted prior to filing this lawsuit, summary judgment in favor of Dr. Gore, Nurse Smith, and Nurse Kee is appropriate because the pleadings, affidavits, and exhibits on file demonstrate that the named defendants did not violate plaintiff's Eighth Amendment rights and plaintiff has not produced any evidence to the contrary.

*Banks*, 2016 U.S. Dist. LEXIS 73468, at *12-*13.

Second, several of the holdings cited by Defendants rely on black letter law that neither a mere disagreement between the inmate-patient and his or her doctor nor a mere refusal to provide an inmate with his or her requested course of treatment constitutes a constitutional violation. *See Dulak v. Corizon Inc.,* 2015 U.S. Dist. LEXIS 131291, at \*29 (E.D. Mich. 2015) (stating that the preliminary injunction was denied because the plaintiff essentially had a "disagreement with the treatment or lack of treatment that" he received), *report and recommendation adopted,* 2015 U.S. Dist. LEXIS 129702 (E.D. Mich. 2015); *Johnson v. Frakes,* 2016 WL 4148231, at \*3 (D. Neb. 2016) ("Defendants' failure to provide Plaintiff with Harvoni, his requested course of treatment, does not constitute an Eighth Amendment violation"); *Bernier v. Obama,* ___ F. Supp. 3d ___, 2016 WL 4468159, at \*4 (D.D.C. 2016) ("[A]t most, it appears that the parties disagree on a proper course of treatment for Plaintiff's condition"), *appeal docketed,* No. 16-5281 (D.C. Cir. Sept. 30, 2016); *Melendez,* 2016 WL 5539781, at \*6 ("Although [the plaintiff] disagrees with [his doctor's] assessment, a disagreement between staff and an inmate concerning the latter's course of treatment is not an appropriate basis for finding an Eighth Amendment violation"); *Buchanon v. Mohr,* 2016 WL 4702573, at \*3 (S.D. Ohio 2016) ("Plaintiff is receiving medical care, and those monitoring his medical care have a difference of opinion on the type of care he should receive"), *report and recommendation adopted,* 2016 WL 5661697, at \*1 (S.D. Ohio 2016) ("as the Magistrate Judge correctly concluded, a different [sic] of opinion on the type of care he should receive does not support an Eighth Amendment claim"); *King v. Calderwood,*

2016 WL 4771065, at \*5 (D. Nev. 2016) ("Plaintiff's contentions constitute a disagreement regarding the appropriate course of treatment"), *appeal docketed*, No. 16-16725 (9th Cir. Sept. 28, 2016); *Hankins v. Russell*, 2016 WL 5689892, at \*9 (E.D. Mo. 2016) ("It is undisputed that Plaintiff requests Hepatitis C therapy, but he has provided no evidence, other than his own opinion, that he requires this medication").

This Court does not call the general principals underlying these cases into question. It instead concludes that, in this case, Plaintiff has presented sufficient facts to show more than a mere disagreement as to the proper course of treatment. Instead, Plaintiff has shown that the DOC has implemented a policy that categorically denies certain inmates with chronic hepatitis C from receiving the curative treatment that the DOC's own expert testified he would recommend for a non-prisoner with the same condition. (Cowan Test., Dec. 23, 2015, at 68:7-18).

This is not a mere disagreement with the course of care. Nor is it simply medical malpractice or "an inadvertent failure to provide adequate medical care." *Estelle*, 429 U.S. at 105. Plaintiff has shown that Defendants have deliberately denied providing treatment to inmates with a serious medical condition and chosen a course of monitoring instead. They have done so with the knowledge that (1) the standard of care is to administer DAA medications regardless of the disease's stage, (2) inmates would likely suffer from hepatitis C complications and disease progress without treatment, and (3) the delay in receiving DAA medications reduces their efficacy. "Although medical negligence does not violate the

eighth amendment . . . medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference." See McRaven v. Sanders, 577 F.3d 974, 983 (8th Cir. 2009) (alteration original) (quotation omitted).

Third, two of the cases Defendants cite conclude that the inmate did not present sufficient evidence that the named defendants were responsible for the inmate's injuries. Binford v. Kenney, 2015 WL 6680272, at *4 (E.D. Wash. 2015) (finding inmate "presented no evidence—nor has he even alleged—that any of the named defendants had any role in the creation of the policy to which he objects"), aff'd mem., 2016 WL 4990041 (9th Cir. 2016); Harrell v. Cal. Forensic Med. Grp., 2015 WL 6706587, at *3 (E.D. Cal. 2015) (dismissing inmate's complaint because it "failed to specify how each of the named defendants . . . [was] responsible for plaintiff's alleged injuries"). Here, Plaintiff has named members of the Hepatitis C Treatment Committee as defendants. Plaintiff has also established that the Hepatitis C Treatment Committee made the decision not to give Plaintiff the DAA medications he has requested, (Noel Test., Dec. 23, 2015, at 129:14-18), and that the Committee has the ultimate authority to decide whether Plaintiff receives DAA medications, (Id. at 129:18-21). Further, Plaintiff has shown that Defendant Dr. Noel had a role in crafting the DOC's hepatitis C policies. (Id. at 101:7-13, 126:8-14).

Finally, the last group of cases Defendants cite find that treatment was not medically advisable for the plaintiff in question, there was insufficient evidence that the plaintiff should receive the treatment he or she was seeking, or the plaintiff was receiving the type of

treatment he or she would have been receiving if not in prison, e.g. the standard of care in the community. *See Dulak,* 2015 U.S. Dist. LEXIS 131291, at *19, *29-*30 (finding, among other things, that the plaintiff did not produce evidence that he met criteria for hepatitis C treatment under national standards); *Shabazz v. Schofield*, 2015 WL 5036919, at *2, *5 (M.D. Tenn. 2015) (finding inmate was monitored pursuant to a policy that was "consistent with generally accepted medical practices, regardless of whether the patient is incarcerated or is a free world patient" and that "[d]espite Plaintiff's arguments, he has submitted no medical proof that he should be receiving the therapy he seeks"), *report and recommendation adopted*, 2016 WL 540727 (M.D. Tenn. 2016); *Binford,* 2015 WL 6680272, at *4 (finding "treatment was not medically advisable given [inmate's] current condition"); *Taylor v. Rubenstein*, 2016 WL 1364287, at *3 (N.D. W. Va. 2016) (finding inmate presented no proof that he was "a viable candidate" for treatment with DAA medications); *Allah v. Thomas*, 2016 WL 3258422, at *5 (E.D. Pa. 2016) (dismissing former inmate's complaint on an unopposed motion to dismiss because "his Hepatitis C did not require treatment prior to his incarceration, and his condition was not alleged to have significantly deteriorated while he was in prison"), *appeal docketed*, No. 16-3103 (3d Cir. July 14, 2016); *Buchanon*, 2016 WL 4702573, at *3 (S.D. Ohio 2016) (finding the course of treatment required four years to complete and the plaintiff would have been released prior completion of treatment); *Hankins*, 2016 WL 5689892, at *9 ("It is undisputed that Plaintiff requests

Hepatitis C therapy, but he has provided no evidence, other than his own opinion, that he requires this medication").

Here, the combination of an evolving standard of care and the substantial amount of evidence presented in this case has rendered the above cited cases unpersuasive. Defendant Dr. Noel testified that he could think of no medical reason why Plaintiff should not receive DAA medications. (Noel Test., Dec. 23, 2015, at 154:8-15). Plaintiff presented evidence that the national standard is to treat all those with chronic hepatitis C—with limited exceptions—with DAA medications. (Findings of Fact, *supra*, ¶¶ 18-21). Further, the DOC's own expert testified that, if he encountered a patient with chronic hepatitis C outside the prison system, he would recommend treatment with DAA medications if the patient could afford it. (Cowan Test., Dec. 23, 2015, at 68:7-18). This Court, therefore, does not come to the same conclusions as those courts that had less information and that were applying a now out-of-date standard of care.

Defendants cite one other case, not mentioned above, that merits consideration, *Smith v. Corizon, Inc.*, 2015 WL 9274915 (D. Md. 2015). In *Smith*, the plaintiff, a state prisoner proceeding pro se, alleged that prison officials failed to treat his hepatitis C. *Id.* at *1. In June, 2015, the plaintiff was evaluated for treatment with Harvoni and it was determined that he was not a priority candidate for treatment. *Id.* at *5. The plaintiff responded by questioning "why his condition should be allowed to get worse and it be acceptable for defendants to simply monitor his situation with chronic care reviews." *Id.* On

a motion to dismiss converted to a motion for summary judgment, the court held that "the complaint fail[ed] to allege conduct rising to the level of deliberate indifference." *Id*. Noting that hepatitis C does not require treatment in all cases and that the plaintiff had been mostly asymptomatic, the court found that monitoring the plaintiff's condition satisfied the constitutional standard. *Id*. at *5-*6.

This Court declines to adopt the reasoning of *Smith* for several reasons. First, although it is clear that the plaintiff's medical records were before the court in *Smith*, it is not clear what information, if any, the court had about the negative health effects of even asymptomatic hepatitis C. Second, in *Smith* the decision not to provide Harvoni to the plaintiff was made in June of 2015. At that time, the AASLD and CDC had yet to recommend DAA medications for all those with chronic hepatitis C. Finally, there is no indication that the prioritization protocol used by the prison in *Smith* completely barred treatment with DAA medications—as opposed to prioritizing it—for those without advanced stage hepatitis C as the DOC's policy in question here does. Thus, the facts of *Smith* are quite distinct from the facts before this Court.

In sum, the Court finds Plaintiff has established a reasonable likelihood of success of showing that Defendants were deliberately indifferent to his serious medical need. The Court will therefore turn to the other three preliminary injunction factors.

*2. The extent to which the moving party will suffer irreparable harm without injunctive relief.*

"[T]o show irreparable harm a plaintiff must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)). "Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

Here, as documented extensively above, Plaintiff has a serious medical condition. He will continue to suffer from chronic hepatitis C if he does not receive treatment. His liver will continue to scar and its functioning will continue to deteriorate. Further, the efficacy of the DAA medications will likely be reduced if treatment is delayed. This is sufficient to show that Plaintiff will suffer irreparable harm if this Court does not grant a preliminary injunction. The realities of civil litigation make it likely that waiting for resolution at trial will prolong Plaintiff's suffering for a significant period of time and result in an overall deterioration of his health.

*3. The extent to which the nonmoving party will suffer irreparable harm if the injunction is issued.*

In considering the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued, the Court must balance the harms suffered by each party. *See Am.*

*Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012)

(describing the third factor as "whether granting preliminary relief will result in even greater

harm to the nonmoving party"). Here, the only conceivable injury Defendants will suffer is

monetary. As a result of the grant of this injunction, Defendants will be required to treat

Plaintiff with expensive medication. While the Court is sensitive to the realities of budgetary

constraints and the difficult decisions prison officials must make, the economics of providing

this medication cannot outweigh the Eighth Amendment's constitutional guarantee of

adequate medical care. *See Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 336-37.

### 4. The public interest.

"[I]f a plaintiff demonstrates both a likelihood of success on the merits and

irreparable injury, it almost always will be the case that the public interest will favor the

plaintiff." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir.

1994). The public "interest is particularly strong where the right to be vindicated derives

from the United States Constitution." *Johnson v. Wetzel*, ___ F. Supp. 3d ___, 2016 WL

5118149, at *11 (M.D. Pa. 2016). Here, issuance of a preliminary injunction will serve the

public interest in that it will vindicate Plaintiff's constitutional right to receive adequate

medical care while in the custody of the state.

## VI. CONCLUSION

For the reasons stated above, the Court will grant Plaintiff's motion for a preliminary

injunction. A separate Order follows.

43

Robert D. Mariani
United States District Judge